JEAN W. & others[1] *vs.* COMMONWEALTH & others.[2]

Essex. September 15, 1992. - March 8, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Governmental Immunity. Commonwealth*, Liability for tort, Duty to prevent harm. *Actionable Tort. Negligence*, Public officer. *Massachusetts Tort Claims Act. Parole.*

In a negligence action under G. L. c. 258, the Massachusetts Tort Claims Act, arising from injuries to the plaintiffs by a prisoner who allegedly had been released on parole due to administrative errors on the part of employees of the Commonwealth, the plaintiffs were to have leave on remand to file an amended complaint alleging facts to show the applicability of the special relationship exception to the public duty rule, either by reason of the existence of a special relationship between the plaintiffs and the defendants, as in *Irwin* v. *Ware*, 392 Mass. 745 (1984), and *A.L.* v. *Commonwealth*, 402 Mass. 234, 254-255 (1988), or, alternatively, a special relationship between the defendants and the prisoner, as contemplated by Restatement (Second) of Torts § 320 (1965). [497, 513-514]

Discussion by LIACOS, C.J., of the development of the public duty rule, a judicially created doctrine that protects governmental units from liability under G. L. c. 258, the Massachusetts Tort Claims Act, unless a plaintiff can show that the duty breached was owed to the injured person himself, and not merely to the public at large; announcement of intention to abolish the public duty rule at the first available opportunity after the conclusion of the 1993 session of the Legislature. [499-513]

WILKINS, J., with whom ABRAMS, J., joined, concurring in the result. [514-515]

O'CONNOR, J., with whom NOLAN and LYNCH, JJ., joined, concurring in the result, would adhere to the traditional public duty rule as the law of the Commonwealth, but was of the view that the rule did not fit the circumstances of the case as set forth in the complaint. [515-523]

GREANEY, J., concurring in the result. [523-525]

---

[1]Joshua W. and Nathaniel W., minor children, by their mother.

[2]The Massachusetts Parole Board and the Department of Correction.

CIVIL ACTION commenced in the Superior Court Department on January 31, 1991.

The case was heard by *Andrew G. Meyer*, J., on a motion to dismiss.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Michael P. Hickey* for the plaintiffs.

*Mark P. Sutliff*, Assistant Attorney General (*Timothy A. Mullen*, Assistant Attorney General, with him) for the Commonwealth.

BY THE COURT. The judgment of the Superior Court dismissing the complaint is reversed. The plaintiffs shall have thirty days from the date of the issuance of the rescript to file an amended complaint in the Superior Court. The case is remanded to the Superior Court for further proceedings.

*So ordered.*

Separate opinions of Chief Justice Liacos; Justice Wilkins, with whom Justice Abrams joins; Justice O'Connor, with whom Justices Nolan and Lynch join; and Justice Greaney appear below.

LIACOS, C.J. (concurring). John Zukowski, allegedly also known as John Zukoski, was convicted of murder in the second degree on May 11, 1972. He was sentenced to life imprisonment. In September, 1985, the Massachusetts Parole Board (parole board) denied his application for parole. Zukowski was again eligible for parole in September, 1986, and, again, the parole board denied his application. After this denial, a clerk employed by the parole board telephoned the Department of Correction at the institution where Zukowski was held and indicated, incorrectly, that Zukowski had been granted parole. Zukowski was released from custody. Between his release and the incident giving rise to this suit, Zukowski regularly reported to a parole officer, who

failed to discover that Zukowski had been released erroneously.

On March 23, 1987, six months after his release, Zukowski raped, beat, and threatened the plaintiff Jean W. while she was in her home with her two minor children. Her son Joshua witnessed a portion of the attack. For this incident, Zukowski was convicted of aggravated rape and assault and battery by means of a dangerous weapon.

The plaintiffs brought suit in the Superior Court pursuant to the Massachusetts Tort Claims Act (Act), G. L. c. 258 (1990 ed.). They alleged that the Commonwealth, the parole board, and the Department of Correction were negligent in releasing Zukowski after his parole application had been denied and in failing to discover, in the ensuing six months, that Zukowski's release was error. The defendants moved to dismiss the plaintiffs' complaint pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), contending that the plaintiffs failed to state a claim because the defendants did not owe the plaintiffs a duty different from the duty owed to the public. The judge below agreed and allowed the defendants' motion.[1] This court transferred the appeal here on its own initiative.

In appealing from the dismissal of their complaint, the plaintiffs argue that there was a special relationship between them and the defendants which would justify liability. This special relationship, they argue, arises from the fact that they were foreseeable victims of the negligence of the defendants.[2] The defendants argue that the plaintiffs were neither foreseeable victims nor part of a specially designated subclass and that the defendants owed them no duty different from

[1]The plaintiffs' complaint also alleged civil rights violations pursuant to G. L. c. 12, § 11I (1990 ed.), and 42 U.S.C. § 1983 (1988). While the defendants' motion to dismiss was directed only to the negligence counts, the plaintiffs did not object to the dismissal of the civil rights counts, either in their motion for reconsideration or in this appeal. Consequently, these issues are treated as waived.

[2]The record in no way suggests that Jean W. knew or had any prior dealings with Zukowski.

the duty owed to the general public. The defendants further argue that public policy requires the liability of governmental entities to be limited to instances where a special duty is owed.

We, the author of this opinion and those Justices who join in his views, believe that this requirement of a special duty for governmental liability, commonly referred to as the public duty rule, is inconsistent with the Act, and we announce our intention to abolish the rule, as described below. We have concluded that our prior efforts to distinguish viable claims from those subject to dismissal by use of the public duty-special relationship dichotomy have not succeeded in producing a rule of predictable application. Further, having reviewed our recent decisions on the subject, we note that the result has been to resurrect effectively the antiquated and outmoded concepts of sovereign immunity which we and the Legislature have sought to shed. See *Whitney* v. *Worcester*, 373 Mass. 208, 210-212 (1977); G. L. c. 258. Although some of the Justices previously have expressed concern regarding the fiscal consequences of abolishing the public duty rule, further experience and reflection lead us to conclude that the limitations on liability imposed by the Legislature in the Act, coupled with the requirement that a plaintiff prove each of the traditional elements of negligence, provide adequate protection to the public fisc. The Legislature, nevertheless, should be afforded an opportunity to consider whether it wishes to respond to this anticipated change by passing additional limitations on liability. We therefore announce our intention to abolish the public duty rule at the first available opportunity after the conclusion of the 1993 session of the Legislature.[3]

---

[3]Today's action is similar to the position this court took in *Whitney* v. *Worcester*, 373 Mass. 208 (1977), regarding our intention to abrogate sovereign immunity. There is an important difference, however. In *Whitney* v. *Worcester*, we urged the Legislature to take action to abrogate sovereign immunity, and indicated that if it did not do so legislatively, we would do so judicially. Here, by contrast, we are inviting the Legislature to consider the forthcoming change in decisional law, and to make any preparations for the change that it deems appropriate.

In 1978, in response to several entreaties by this court, see *Whitney* v. *Worcester, supra,* the Legislature enacted the Massachusetts Tort Claims Act. St. 1978, c. 512, § 15. The Act abolished the absolute immunity that governmental units had enjoyed previously. The Act provides in part: "Public employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances." G. L. c. 258, § 2. The Act limits liability to $100,000 per plaintiff, *id.*; see *Irwin* v. *Ware,* 392 Mass. 745, 766 (1984), and by express provision does not apply to claims arising from the exercise of discretionary functions. G. L. c. 258, § 10.[4]

Despite these express limitations on liability in the Act, this court ventured a further limitation in *Dinsky* v. *Framingham,* 386 Mass. 801 (1982). In an attempt to protect municipalities from becoming "insurer[s] of each and every construction project," we held that no liability could be found for the negligent issuance of a building permit which resulted in the plaintiffs' property being damaged by flooding. *Id.* at 802, 810. Our basis for insulating the town from liability was the so-called public duty rule.

The public duty rule, broadly stated,[5] is a judicially-created doctrine that protects governmental units from liability

---

[4]The Act also protects public employers from levy of execution on real or personal property to satisfy judgment, precludes the recovery of punitive damages or interest prior to judgment, requires plaintiffs to follow a detailed presentment procedure, and excepts: (1) all claims based on acts or omissions that occur while the public employee is exercising due care in executing any statute, regulation, ordinance or by-law; (2) all claims arising from intentional torts; and (3) all claims arising from the assessment or collection of any tax, or the lawful detention of any property by a law enforcement officer. G. L. c. 258, §§ 2, 4, 10.

[5]We note at the outset that we have defined and redefined the rule with so many shades and shadows that any "broad statement" of it will necessarily be inadequate. The fact that we find it difficult to define this doctrine reflects the difficulty of applying it consistently and evenhandedly.

unless an injured person seeking recovery can show that the duty breached was a duty owed to the individual himself, and not merely to the public at large. *Onofrio* v. *Department of Mental Health*, 408 Mass. 605, 609 (1990), *S.C.*, 411 Mass. 657 (1992). 7 E. McQuillan, Municipal Corporations § 53.04b, at 165 (3d ed. rev. 1984). In *Dinsky*, we held that, because the building code was designed to benefit the public generally, there could be no liability to an individual for a negligent failure to enforce it. *Dinsky*, *supra* at 810. The reason there could be no liability, we held, was grounded in the notion of duty. "In order to maintain an action for an injury to person or property by reason of negligence or want of due care, there must be shown to exist some obligation or duty towards the plaintiff, which the defendant has left undischarged or unfulfilled." *Id.* at 804-805, quoting *Sweeny* v. *Old Colony & Newport R.R.*, 10 Allen 368, 372 (1865). We then evaluated the notion of duty differently from the way we do in a tort case not involving a public entity, focusing on whether building commissioners' statutory duties were designed to benefit the public or private individuals. "There does not appear to be any language in the enactments [imposing obligations on building commissioners] which would warrant a finding that the Legislature intended to create private causes of action for property owners on the facts of this case. The enactments confer no specific duties upon building commissioners or inspectors with regard to individual citizens or property owners." *Id.* at 809. We did not, in *Dinsky*, consider explicitly whether a requirement that this type of duty be shown was compatible with the Act.

In general, "circumstances alone may establish a duty which would not exist independent of them." J.R. Nolan & L.J. Sartorio, Tort Law § 206, at 342 (2d ed. 1989). The circumstances of *Dinsky* were that a building commissioner issued building and occupancy permits for the plaintiffs' property after specific preconditions set by the health department were not met. *Id.* at 802. *Dinsky* indicated that a duty to the plaintiffs could have been found only if the building

code had stated expressly that private individuals were to benefit from it. *Id.* at 809-810.

Thus, Dinsky articulated one exception to the public duty rule. Acting on the same premise of a need for an exception to the public duty rule, we invoked the so-called "special relationship" exception in *Irwin* v. *Ware*, 392 Mass. 745 (1984). See *A.L.* v. *Commonwealth*, 402 Mass. 234, 254-255 (1988) (O'Connor, J., dissenting) (describing development of two exceptions to public duty rule).

In *Irwin*, police officers from the town of Ware allowed an obviously intoxicated driver, whom they had detained, to return to his automobile and continue driving. Shortly thereafter, the driver caused an accident which injured the plaintiffs and killed their decedents. In considering the applicability of *Dinsky* and the public duty rule to those facts (i.e., whether the officers' duty of care ran only to the public), we recognized the inherent conflict between the public duty rule and the Act. "Arguably, this principle contains a seed which could reintroduce a broad-based municipal tort immunity: whereas most public employees when acting within the scope of their employment ultimately are doing so in furtherance of the public good broadly defined, the principle of 'public duty' discussed in *Dinsky* would exempt public employers from tort liability for the negligence of most public employees. Presumably, only where the Legislature specifically designated an identifiable sub-class as the intended beneficiaries of certain public acts would a public employer be open to tort liability. . . . *Clearly, such a broad reading of our* Dinsky *opinion runs directly contrary to the spirit of G. L. c. 258 and our decision in* Whitney v. Worcester, *373 Mass. 208 (1977). We did not intend our language in* Dinsky *to be so read.*" (Citation omitted, emphasis supplied.) *Irwin, supra* at 755. Thus, we indicated that *Dinsky* could not be read so broadly as to swallow the Act.

We attempted to reconcile this conflict between the Act and the public duty rule by fashioning the "special relationship" exception to the public duty rule. We concluded that the officers in *Irwin* owed the plaintiffs a special duty, more

particular than the duty police owe to the general public to keep the streets safe. *Irwin, supra* at 762. The basis of this special duty, we held, was the special relationship created by statutes governing police officers' duties regarding intoxicated operators of motor vehicles.[6] *Id.* at 759-760.

In only one other public duty case, *A.L.* v. *Commonwealth*, 402 Mass. 234 (1988), did we find the "special relationship" necessary to impose liability under the public duty rule.[7] The plaintiffs in that case were two young boys who were molested by a probationer teaching at their school. A specific condition of his probation forbade him from teaching in a school with young boys, but the Commonwealth's probation officer failed to verify the probationer's employment. We found that the specificity of the probation order created a special relationship between the plaintiff boys and the Commonwealth. *Id.* at 241. Additionally, as in *Irwin*, we also focused on the question of foreseeability and concluded that it was foreseeable that the probationer, if allowed to teach in a school, would molest young boys. *A.L., supra.*

In no other public duty case have we discovered the special relationship necessary to invoke the exception to the public duty rule, although many of the litigants have offered statutes and regulations that, in light of *Irwin* and *A.L.*, would seem to confer special relationships. See *Sampson* v. *Lynn*,

---

[6]While we referred in *Irwin* v. *Ware*, 392 Mass. 745 (1984), to the "special relationship" created by statute, we also held that the foreseeability of the harm was the "most crucial factor" justifying liability. *Irwin, supra* at 762. Because the officers should have known of the harm they would unleash by allowing the intoxicated driver to continue on his way, and were in a unique position to prevent that harm, we held that they had a duty to any foreseeable victim of that harm.

[7]Three members of this court have urged that *Irwin, supra*, and *A.L.* v. *Commonwealth*, 402 Mass. 234 (1988), be overruled, and that the public duty rule, together with the special relationship exception, be more forcefully embraced. See *Cyran* v. *Ware*, 413 Mass. 452, 467 (1992) (O'Connor, J., concurring, with whom Nolan and Lynch, JJ., joined). We think it noteworthy that since the enactment of the Act, only two decisions of this court have allowed potential recovery on the basis of a special relationship: Only *Irwin* and *A.L.* have produced a result other than upholding governmental immunity.

405 Mass. 29 (1989) (statutes governing firearm licenses create no special relationship between city and victim of gunshot); *Connerty* v. *Metropolitan Dist. Comm'n,* 398 Mass. 140, 143-145 (1986) (no special relationship between agency and clam digger despite environmental statutes protecting clamming areas); *Appleton* v. *Hudson,* 397 Mass. 812, 815-816 (1986) (no special duty where police failed to take action in ongoing sale of liquor to minors); *Nickerson* v. *Commonwealth,* 397 Mass. 476 (1986) (no special relationship between Registrar of Motor Vehicles and individual harmed by uninsured driver, despite registrar's failure to revoke driver's registration); *Ribeiro* v. *Granby,* 395 Mass. 608 (1985) (no liability when failure to require correction of known code violation resulted in death in fire).

While *Irwin* and *A.L.* may "have their place in a plan of evolving law," *Cyran* v. *Ware,* 413 Mass. 459 (1992), we recognize today that, unchecked, this evolution has led not to action-guiding refinements of the public duty doctrine, but to a "rule" composed of inconsistent and irreconcilable parts, the sum of which leaves both the Justices and litigants quite incapable of predicting when and why liability will be imposed. Addressing an earlier application of the public duty rule in New York, Chief Judge Desmond wrote: "Any court-created tort-immunity rule should be forthrightly abandoned when its injustice and its unreality are so evident as to produce exceptions, interpretations and inconsistencies galore . . . ." *Motyka* v. *Amsterdam,* 15 N.Y.2d 134, 140 (1965) (Desmond, C.J., dissenting). We agree.

Two recent cases demonstrate the confusion engendered by the public duty rule and the special relationship exception. In *Onofrio* v. *Department of Mental Health,* 408 Mass. 605 (1990), and *Mamulski* v. *Easthampton,* 410 Mass. 28 (1991), we declined to apply the public duty rule to the facts of those cases, despite the fact that the lower courts and the litigants in both cases had treated the cases as public duty cases. *Id.* at 29. *Onofrio, supra* at 609. In *Onofrio,* the Department of Mental Health (DMH) had placed an individual in Onofrio's rooming house without informing him that the

individual had a history of starting fires, or even that the individual had a history of mental instability. After a fire set by the tenant destroyed Onofrio's property, Onofrio filed suit against the DMH. The trial judge found that Onofrio could recover because he was in a "special relationship" with the DMH, and thus, fell within the exception to the public duty rule. *Onofrio, supra* at 608. We held that neither the public duty rule nor its special relationship exception was applicable to a case of that kind: "The rule applies only to situations, like those present in *Irwin* v. *Ware, supra,* and its progeny, in which a plaintiff has been directly harmed by the conduct of a third person and only indirectly by a public employee's dereliction of a duty — a duty imposed on him solely by his contract of employment — to interrupt or prevent the third person's harmful activity." *Id.* at 609-610. We went on to conclude that "[t]he DMH employees owed Onofrio a duty of care, not because they were employed to protect persons such as Onofrio and failed to do so, but because, by taking action that exposed Onofrio to risk, they were bound, as any other person would be, to act reasonably." *Id.* at 610.

In *Mamulski, supra,* the plaintiff's decedent was killed in an automobile accident that allegedly resulted from the town of Easthampton's negligent failure to replace a missing stop sign. Although the parties had concerned themselves with arguments relating to whether the town owed a general or a special duty, we determined that the public duty rule did not apply because "this case is not necessarily one in which a person has been harmed directly by the wrongful conduct of a third person where a public employee may have failed in his duty to enforce the law and thereby to interrupt or prevent that third person's harmful activity." *Mamulski, supra* at 29. *Onofrio* and *Mamulski* thereby appeared to limit the applicability of the public duty rule to circumstances where some intervening wrongdoer had not been prevented from harming the plaintiff.[8]

---

[8] The fact that *Dinsky* v. *Framingham*, 386 Mass. 801 (1982), which established the public duty rule, involved no intervening perpetrator stands

Our most recent public duty case, *Cyran* v. *Ware*, 413 Mass. 452 (1992), underscores the need for clarification. *Cyran* involved the alleged negligence of the town of Ware's fire department in fighting a fire at a residential building owned by the plaintiffs. Like *Dinsky*, it did not involve an intervening perpetrator. Thus, under the principles governing the applicability of the public duty rule announced in *Onofrio*, it seems that the public duty rule ought not to have applied. In a decision distinguished by the division it produced among the Justices, the court held that the public duty rule precluded recovery for any alleged negligence.

In *Cyran*, Justice Greaney, joined by the author of this opinion, relied on the public duty special relationship dichotomy and concluded that no liability attached because "[t]his case falls within the public duty rule." *Id.* at 455. Justice O'Connor, with whom Justices Nolan and Lynch joined, agreed that the public duty rule barred liability. *Id.* at 460. Justice Wilkins, with whom Justice Abrams joined, dissented, sounding a note for reexamination of the public duty rule. *Id.* at 471. He concluded, nevertheless, that the claim in *Cyran* fell under the rubric of *Irwin* because there was "no meaningful basis" to permit liability in *Irwin* and *A.L.* and to deny it in *Cyran. Id.* at 472.

Thus, in *Cyran*, five Justices felt the result reached was incompatible with the doctrine of *Irwin* and *A.L.* (Justices Wilkins, Abrams, O'Connor, Nolan, and Lynch). Three (Justices O'Connor, Nolan, and Lynch) called for the overruling of *Irwin* and *A.L.* Four would adhere, at that time, to *Irwin* and *A.L.* (Chief Justice Liacos, Justices Wilkins, Abrams, and Greaney), but two felt liability precluded and two did not.

In his concurrence in *Cyran*, Justice O'Connor, with whom Justices Nolan and Lynch joined, expanded the formulation set forth in *Onofrio* and *Mamulski* of the applicability of the public duty rule. Rather than applying the public duty rule

out as a further example of the difficulty we have had in maintaining a stable, reasoned use of the public duty rule.

only when the public employee fails to prevent a third person from harming the plaintiff, Justice O'Connor argued that the rule should apply to situations "in which a plaintiff has been harmed by a condition or situation which was not originally caused by the public employee, and is attributable to the employee only in the sense that the employee failed to prevent or mitigate it." *Cyran, supra* at 467 (O'Connor, J., concurring). This formulation of the public duty rule apparently relies either on a distinction between acts and omissions, or a distinction between misfeasance and nonfeasance. The Act, however, expressly applies to acts or *omissions*. G. L. c. 258, § 2. Furthermore, both *Cyran* and *Mamulski* can be characterized easily either as cases of misfeasance or nonfeasance. The firefighters in *Cyran* allegedly fought a fire badly and the officials in *Mamulski* allegedly regulated traffic badly. Conversely, the fire fighters may have failed to carry out their duty to fight fires reasonably and the officials may have failed to regulate traffic safely. A standard so flexible cannot provide the certainty and predictability essential to the law.[9] See F. Harper, F. James & O. Gray, Torts § 18.6 (2d ed. 1986).

---

[9]Justice O'Connor, in his concurrence, insists nonetheless on perpetuating this distinction. "Here . . . the public employees are charged in the complaint with taking action that caused injury to the plaintiffs. The plaintiffs claim that they suffered injuries as a result of a parole board clerk's having incorrectly informed Department of Correction personnel that the parole board had voted to parole an identified prisoner and department personnel having released the prisoner in violation of established department procedure." *Post* at 516. What Justice O'Connor does not mention, is that part of the "conduct" complained of is the alleged *failure* to verify the parole board's decision, as required by department policy, and the alleged *failure* to discover, in the six months between Zukowski's release and his attack of the plaintiff, that the release was a mistake. None of the defendants is alleged to have attacked Jean W. any more than the firefighters in *Cyran* were charged with starting the blaze. The defendants allegedly failed to protect Jean W. from Zukowski, regardless of whether this failure was composed of affirmative acts or omissions. As we pointed out in *Whitney* v. *Worcester*, "[d]ecisions as to immunity should not be influenced by the finite distinctions drawn in these [misfeasance-nonfeasance] cases, distinctions which have no real connection with sound reasoning or policy." *Whitney* v. *Worcester*, 373 Mass. 208, 221 (1977).

While it is true that "[i]n the absence of special assurances having been given, the law imposes no duty on a private individual carefully to extinguish a fire he did not cause, or carefully to remove from the highway an intoxicated motorist whose intoxication or presence on the highway he did not bring about," *Cyran, supra* at 468 (O'Connor, J., concurring), the law does impose a duty to exercise due care on a private individual who voluntarily undertakes either of these tasks. *Black* v. *New York, N.H. & H.R.R.*, 193 Mass. 448, 450 (1907). The fact that a public employee's employment imposes on him an affirmative duty to act where a private person would not have such a duty does no more than identify the source of the duty. Private persons have affirmative duties arising from their employment responsibilities that others do not have. For example, the manager of an inn has duties to the public that he would not have were it not for his employment, and these duties might well require him to prevent or mitigate harm brought about by a situation not caused by him. By express provision of the Act, public employers may not be treated differently from private persons. As private persons may be liable for carrying out their peculiar duties, so may public employers. As we recognized in *Onofrio*, "one who takes action ordinarily owes to everyone else who may be affected thereby a duty to act reasonably." *Onofrio, supra* at 610. The responsibility a public employee may have to perform an act may arise from a statute or ordinance, but the duty to perform the act with reasonable care arises from the common law of negligence. See *Brennen* v. *Eugene*, 285 Or. 401, 407 (1979).

By recognizing that the public duty rule is incompatible with the Act, we align ourselves with most jurisdictions that have squarely considered the issue. While a sizeable number of jurisdictions still adhere to the public duty rule, see, e.g., *Shore* v. *Stonington*, 187 Conn. 147 (1982); *Randall* v. *Fairmont City Police Dep't*, 186 W. Va. 336 (1991), the trend

has been to abolish the rule.[10] See *Adams* v. *State*, 555 P.2d 235 (Alaska 1976); *Leake* v. *Cain*, 720 P.2d 152, 158-159 (Colo. 1986); *Adam* v. *State*, 380 N.W.2d 716, 724 (Iowa 1986); *Maple* v. *Omaha*, 222 Neb. 293, 301 (1986); *Schear* v. *County Comm'rs*, 101 N.M. 671 (1984); *Coffey* v. *Milwaukee*, 74 Wis. 2d 526 (1976); *DeWald* v. *State*, 719 P.2d 643, 653 (Wyo. 1986). Indeed, of the jurisdictions whose cases we relied on in adopting the public duty rule in *Dinsky*, at least three have overruled their prior decisions and abolished the public duty rule. See *Ryan* v. *State*, 134 Ariz. 308, 310 (1982); *Commercial Carrier Corp.* v. *Indian River County*, 371 So. 2d 1010, 1015-1016 (Fla. 1979); *Brennen*, *supra* at 406-409.

Those courts that abolished the rule in the immediate wake of the abrogation of sovereign immunity relied on the fundamental inconsistency between the two principles. See, e.g., *Adams*, *supra* (public duty doctrine creates immunity where Legislature has removed it); *Commercial Carrier Corp.*, *supra* (general duty-special duty has no vitality in wake of tort claims act). Other courts have abolished the rule on realizing that its application "creates needless confusion in the law and results in uneven and inequitable results in practice." *Leake*, *supra* at 159. See *Ryan*, *supra* at 310. Judges and commentators criticizing the rule have focused on the unfairness inherent in a rule that results in a duty to none when there is a duty to all, and pointed out the tortured analyses that result when courts seek to avoid such harsh results without squarely facing the underlying problem. See

---

[10]We note that some of the jurisdictions upholding the validity of the public duty rule have distinguished themselves from those States abandoning the rule by pointing out that those other States provide other limitations on governmental liability, such as a discretionary act exception. See *Gordon* v. *Bridgeport Hous. Auth.*, 208 Conn. 161, 182-183 (1988), and cases cited; *Benson* v. *Kutsch*, 181 W. Va. 1, 3 (1989). Under this analysis, Massachusetts should fall squarely on the side of those States abandoning the rule, given the limitations on liability imposed by the Act, see G. L. c. 258, § 10 (*b*) (discretionary act exception); G. L. c. 258, § 10 (*c*) (intentional tort exception), and our decision today affords the Legislature an opportunity to consider the need for further limitations.

*Rollins* v. *Petersen*, 813 P.2d 1156, 1166 (Utah 1991) (Durham, J., concurring and dissenting); *Taylor* v. *Stevens County*, 111 Wash. 2d 159, 172-173 (1988) (Utter, J., concurring). See also Note, Government Liability and the Public Duty Doctrine, 32 Vill. L. Rev. 505 (1987); Note, Governmental Liability for Negligent Failure to Detain Drunk Drivers, 77 Cornell L. Rev. 873 (1992). As to our own decisions, Professor Glannon has stated: "The cases from the [Supreme Judicial Court], like those from other courts, have not managed to draw an intellectually defensible line between immune 'public' duties and actionable negligence." Glannon, The Massachusetts Tort Claims Act: Analysis and Update, 75 Mass. L. Rev. 52, 64 (1990). In fairness to litigants, and in recognition of the language of the Act, this court anticipates the day when it can cease this speculative and ultimately unwieldy exercise.

While we announce our intention to abolish the public duty rule, we note that we have taken seriously the underlying rationale for the rule: protecting the Commonwealth and municipalities from excessive financial burdens. *Cyran* most forcefully highlighted these concerns: "[I]f . . . the court were to conclude in this case that municipal firefighters owe individual citizens a duty of careful firefighting, violation of which would result in municipal liability, that holding would have serious, and perhaps overwhelming ramifications for cities and towns . . . the resulting potential liability would be staggering." *Id.* at 463 (O'Connor, J., concurring). We acknowledge the concerns expressed in *Cyran*, but believe that they are addressed in the first instance by the language of the Act,[11] and in the second, by traditional tort principles. Speculation about increased burdens on the Commonwealth

---

[11]We emphasize again that the Legislature inserted specific limitations on liability in the Act, e.g., no liability for intentional or discretionary acts, no recovery over $100,000 per plaintiff, see *supra* at 500. The Supreme Court of Nebraska focused on similar express limitations in its decision refusing to apply the public duty rule: "Limitations are found in [the Act] which exclude acts based on the execution of a statute, discretionary functions, assessment or collection of taxes, establishment of a quarantine, or assault and battery. Nowhere is there found an exemption for the exercise

or municipalities is best addressed to the Legislature, and it is for this reason that we have chosen to delay our abolition of the public duty rule until the conclusion of the next Legislative session. If the Legislature believes that certain activities require more stringent protection, it may provide such protection.[12]

Even after the public duty rule ceases to bar liability, a plaintiff's burden of establishing the elements of negligence will go some additional way toward protecting the Commonwealth and municipalities from liability. The mere *existence* of a duty does not create liability: there must also be a breach of that duty, causation, and harm.[13] See *Dinsky*, *supra* at 804. Especially in instances where the public employee's purported negligence stems from a failure to prevent or to mitigate a harmful situation that he did not cause, a plaintiff's burden of establishing proximate cause will be sig-

---

of a duty owed to the public generally." *Maple* v. *Omaha*, 222 Neb. 293, 301 (1986).

[12]For example, after Alaska abrogated the public duty rule in *Adams* v. *State*, 555 P.2d 235 (Alaska 1976), the Legislature enacted a statute precluding municipal liability for negligent inspections. See Alaska Stat. § 09.65.070(d)(1) (1992). See also *Wilson* v. *Anchorage*, 669 P.2d 569 (Alaska 1983) (discussing statute as response to *Adams*).

Additionally, many States have enacted statutes specifically shielding from liability many of the governmental activities at issue in public duty cases. See Cal. Gov't Code §§ 818.6, 846 (West 1980) (no liability for negligent inspection or for injury caused by failure to arrest or retain person in custody); Ill. Rev. Stat. c. 85, par. 4-102, par. 5-102 (1987) (no liability for failure to prevent crime, or for failure to suppress fire); N.J. Stat. Ann. § 59:2-6 (1992) (no liability for negligent inspection or failure to inspect).

This list is by no means exhaustive. In providing these citations, we do not mean to suggest to the Legislature how it should proceed, or even that it should proceed. It may well be that the Legislature is satisfied with the limitations on liability already contained in the Act.

[13]Justice O'Connor believes that by abolishing the public duty rule, we shall create new duties and thus new torts. *Post* at 515. He misperceives the court's position. By refusing to recognize the public duty rule as a bar to liability, we shall merely prevent a public entity from being treated differently from a private person *in like circumstances*. If the circumstances impose a duty, that duty should be imposed regardless of the public or private status of the party. See *Cyran*, *supra* at 469-470 (Wilkins, J., dissenting) (drawing analogy to private fire department).

nificant. The requirements of foreseeability and immediacy of harm that we relied on so heavily in *Irwin* will assume great relevance. Liability was appropriate there not because of some artificial "special relationship" between the plaintiffs and the officers, but because the officers were in a unique position to prevent the harm that was foreseeable. The identity of the particular individual harmed was not relevant — any member of the public was at risk. Had the motorist run down a child on his bicycle or driven off the road and into someone's living room, the negligence of the officers would have been the same. [14]

Officers can act reasonably without apprehending and detaining every potentially intoxicated motorist on the highways. For example, in *Leake* v. *Cain*, 720 P.2d 152 (Colo. 1986), the Supreme Court of Colorado abolished the public duty rule, then went on to find that, under conventional tort principles, police officers did not breach any duty when they failed to detain an intoxicated teenager, because they reasonably believed that the teenager would not be driving. *Id.* at 162. Police departments are no more responsible for every harm that befalls victims of crime than fire departments are responsible for every sparking of a fire, and neither should be an insurer of every loss sustained in those contexts. But their

---

[14]Chief Justice Hennessey, in the *A.L.* v. *Commonwealth* case, expressed the opposite view, and accepted this fortuity. "Had [the convicted molester, a condition of whose probation forbade teaching in school] molested not a student of the school where he was teaching, but a young boy he encountered at a local playground or in some other extrascholastic context, a different case would be presented." *A.L.* v. *Commonwealth*, 402 Mass. 234, 250 (1988) (Hennessey, C.J., concurring). It may well be that the child molested in the playground would not have recovered, whereas the one in the school would have. The reason for the disparity, however, is not that one child was owed a *special* duty that the other was not, but rather that the victim in the playground would be unable to show causation: the probation officer's failure to ascertain the workplace of his probationer, as required by the conditions of probation, would not have proximately caused the child to be molested in a playground. By exercising the care reasonable in the circumstances, the officer could not have prevented any molestation anywhere.

status as public employers alone should not be a factor in evaluating liability.

Because of our conclusion today to delay implementation of this decision for one legislative session, we are faced with the question of how to dispose of the case at bar. The judge below dismissed the plaintiffs' case because he concluded that the plaintiffs could not show a special relationship between them and the defendants. We disagree. We do not believe that "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim." *Nader* v. *Citron*, 372 Mass. 96, 98 (1977). There are two ways in which the plaintiffs might be able to establish a special relationship. First, the plaintiffs may establish that there was a special relationship between them and the defendants.[15] Secondly, the plaintiffs may establish that a special relationship arises not from any contact between the plaintiffs and the defendants, but rather from the relationship between the defendants and Zukowski. The Restatement (Second) of Torts § 315 recognizes two types of special relationships that may form the basis of an exception to the general principle that a person has no duty to control the conduct of a third person. One exception is based on the finding of a special relation between the actor (i.e., the person whose duty is at issue) and the potential plaintiff. This is the special relation that we focused on in *Irwin* and *A.L.* and referred to above. The other exception set forth in the Restatement arises when there is a special relation between the actor and the third person. We have been criticized for overlooking this portion of the Restatement in our analyses in *Irwin* and *A.L.*, see Glannon, Determining Actionable Tort Duties: The Lessons of *A.L.* v. *Commonwealth*, 2 Mass. Gov't Liab. Rptr. 73, 76 (1988); see also *Rollins* v. *Petersen*, 813 P.2d 1156 (Utah 1991)

---

[15]The plaintiffs suggested at oral argument that they were related to Zukowski, although this had not been alleged in their complaint. We believe that the plaintiffs should be given an opportunity to amend their complaint to include this or any other allegation pertaining to the existence of a special relationship. See *Capazzoli* v. *Holwasser*, 397 Mass. 158, 161 (1986).

(Durham, J., dissenting) (advocating consideration of both types of special relations in public duty cases), and we take this opportunity to recognize it here.

The defendants may have been in a special relationship with Zukowski because of their custody of and control over him. See Restatement (Second) of Torts § 320 (1965). Their duty to control him could arise from this relationship, and would run to all foreseeable victims.[16] Because "we cannot say that when the plaintiffs' counsel reexamine the facts and law they will be unable to state a claim," *Charbonnier* v. *Amico*, 367 Mass. 146, 153 (1975), we concur in the issuance of the order immediately preceding this opinion.

WILKINS, J. (concurring, with whom Abrams, J., joins). I agree that the public duty rule should no longer be engrafted on the Massachusetts Tort Claims Act. Although I do not concur in many respects with the analysis of cases in the opinion of the Chief Justice, I do agree that the result in *Cyran* v. *Ware*, 413 Mass. 452 (1992), has made worthless any continuing attempt at reasoned line-drawing facilitating the establishment of governmental liability in "sufficiently egregious [situations], where the peril [created by a third party] was obvious [to a government agent] and [was] substantial and the class of potential victims was reasonably determinable." *Id.* at 472 (Wilkins, J., dissenting, with whom Abrams, J., joined).

No one should rest content that all problems will be solved by the abandonment of the public duty rule. For the four of us who abandon the rule at least prospectively (and, to a degree, for the three of us who believe the rule inapplicable in cases involving active negligence), the new difficult line-drawing will be in the area of causation. Indeed, the results

---

[16]The plaintiffs will have to establish that they were foreseeable victims. We emphasize here the fact that an entirely different result would obtain if Zukowski had been granted parole, and subsequently attacked Jean W. In that case, a discretionary decision regarding Zukowski's fitness for parole could be involved, and, if so, the Act would bar liability.

in our cases in which the public duty rule has been involved could largely be explained on traditional tort law concepts of causation.

I see no reason to await legislative inaction before implementing the abandonment of the public duty rule. This conclusion is particularly appropriate in this case where three of us believe that the complaint in part alleges a cause of action based on active wrongdoing and that the public duty rule is inapplicable to that extent. The opinion of the Chief Justice, although favoring the plaintiffs' position prospectively, casts doubt on the plaintiffs' chances to recover at all under the public duty rule. Although I find the active-passive negligence dichotomy to be inappropriate where a duty already exists, I would at least forthwith uphold the plaintiffs' active negligence claim. I would additionally free any claim based on a negligent failure to act from the restrictions of the public duty rule. However, because of the views expressed in other opinions, these plaintiffs may not avoid the application of the public duty rule to their claims based on negligent failures to act (at least until the Legislature says otherwise).

O'CONNOR, J. (concurring, with whom Nolan and Lynch, JJ., join). I agree that the decision dismissing the complaint should be reversed and the case should be remanded. I reach that result, however, by an entirely different route from the one taken by some of my colleagues. In my view, the plaintiffs' complaint sets forth a viable claim under the principles articulated in *Onofrio* v. *Department of Mental Health*, 408 Mass. 605 (1990), *S.C.*, 411 Mass. 657 (1992). The resolution of this appeal does not require acceptance or abandonment of the public duty "nonrule" that has evolved in this Commonwealth "composed," as the Chief Justice rightly says, "of inconsistent and irreconcilable parts, the sum of which leaves both the Justices and litigants quite incapable of predicting when and why liability will be imposed," *ante* at 504, nor does it require rejection of the traditional public duty rule that three members of this court have repeatedly

advocated. See *Cyran* v. *Ware*, 413 Mass. 452, 460-472
(1992) (O'Connor, J., concurring with whom Nolan and
Lynch, JJ., joined); *A.L.* v. *Commonwealth*, 402 Mass. 234,
250-251, 251-261 (1988) (Nolan, J., dissenting, with whom
Lynch, J., joined) (O'Connor, J., dissenting, with whom
Lynch, J., joined); *Irwin* v. *Ware*, 392 Mass. 745, 775-777
(1984) (Nolan, J., dissenting, with whom Lynch and
O'Connor, JJ., joined). The traditional public duty rule is a
good rule, but it does not fit the circumstances of this case as
set forth in the complaint.

The traditional rule, about which I shall say more below,
applies only to situations, like those present in *Irwin* v. *Ware*,
*supra*, and its progeny, in which a plaintiff has sustained in-
jury or loss as a result of a public employee's failure to act,
as required by his or her employment contract, to prevent or
diminish the harmful consequences of a condition or situation
not originally caused by the employee. For example, the fire
fighters in *Cyran* v. *Ware*, *supra*, allegedly did nothing to
extinguish a fire, not caused by them, that destroyed the
plaintiffs' home. *Id.* at 469 & n.1 (Wilkins, J., dissenting,
with whom Abrams, J., joined). The traditional public duty
rule would apply to that situation. Here, however, as in
*Onofrio* v. *Department of Mental Health*, *supra*, the public
employees are charged in the complaint with taking action
that caused injury to the plaintiffs. The plaintiffs claim that
they suffered injuries as a result of a parole board clerk's
having incorrectly informed Department of Correction per-
sonnel that the parole board had voted to parole an identified
prisoner and department personnel having released the pris-
oner in violation of established department procedure. This is
not a case in which the only allegation is that the plaintiffs
were injured as a result of a public employee's failure to act
to rectify a situation not created by the employee.

In *Onofrio*, too, the plaintiff asserted that he had sustained
loss as a result of certain conduct (not a failure to act) of a
public employee. The plaintiff claimed that an employee of
the Department of Mental Health (DMH) had solicited the
placement of a DMH client in the plaintiff's home without

informing the plaintiff of the client's known history of property destruction, including fire setting. The client was placed in the plaintiff's home and thereafter set it afire. In *Onofrio*, we held: "The DMH employees owed Onofrio a duty of care, not because they were employed to protect persons such as Onofrio and failed to do so, but because, by taking action that exposed Onofrio to risk, they were bound, as any other person would be, to act reasonably. The employees' duty was no different than it would have been had the employees been acting merely as private individuals." 408 Mass. at 610. The *Onofrio* reasoning applies to the present case. If the plaintiffs' allegations, set forth above, are proved at trial, the public employer will be liable, as was the public employer in *Onofrio*, just as a private individual or employer would be liable in similar circumstances.

The traditional public duty rule is that "the employment duties of public officers and employees ordinarily are owed only to the city, town, county, or State with whom the officers and employees have contracted. Those duties are enforceable only administratively or by criminal proceedings. They are not owed to individuals who may be affected by their nonfulfilment but with whom the employees have not contracted. There are two exceptions. One exception is that, when a statute expressly provides that a public servant's employment duties are designed to benefit a specifically identified group of persons in addition to the general public, the individuals in that group are owed a special duty, violation of which may be actionable. Courts seldom apply that exception. 'Despite numerous references to the statutory intent rationale, it is difficult to find cases which hold that a statute creates a special duty to a particular class of persons.' Glannon, The Scope of Liability Under the Tort Claims Act: Beyond the Public Duty Rule, 67 Mass. L. Rev. 159, 163 (1982). The other exception to the traditional public duty rule is where a 'special relationship' exists between certain individuals and a public agency or employee, such that the public employee's duty to exercise reasonable care to prevent or to minimize harm from conditions not created by the em-

ployee runs not only to the general public as a whole, but to those individuals in particular. A common thread running through the cases applying this exception is that the special relationship is found to exist when the public agency, officer, or employee has expressly or impliedly represented to an individual that special care would be taken for his or her protection, such as a police officer's promising an informant special protection, thus justifying that individual's reliance in a special way on the employee's carrying out of his or her responsibilities. A special relationship for public duty rule purposes is not a creature of statute, but instead is created by conduct of the public agency or employee inducing reliance on the part of the injured person, much in the same way that a contract is created." *Cyran* v. *Ware, supra* at 462-463 (O'Connor, J., concurring).

Although the courts of at least twenty-two other States, an overwhelming majority of those entertaining the question, have embraced the traditional public duty rule, unfortunately that rule has never been accepted by this court, nor is it accepted today. [1] In my view, this is a serious mistake. The rule "fairly reflects current social values and promotes sound public policy. It not only promises reasonably predictable results in cases . . . involving harm indirectly (secondarily) caused

---

[1] See *Williams* v. *State,* 34 Cal. 3d 18, 24-25 (1983); *Shore* v. *Stonington,* 187 Conn. 147, 151-154 (1982); *Warren* v. *District of Columbia,* 444 A.2d 1, 3 (D.C. 1981); *Namauu* v. *City & County of Honolulu,* 62 Haw. 358, 362 (1980); *Fessler* v. *R.E.J., Inc.,* 161 Ill. App. 3d 290, 295 (1987); *Crouch* v. *Hall,* 406 N.E.2d 303, 304-305 (Ind. Ct. App. 1980); *Fudge* v. *Kansas City,* 239 Kan. 369, 371-372 (1986); *Ashburn* v. *Anne Arundel County,* 306 Md. 617, 626-628 (1986); *Jones* v. *Wilcox,* 190 Mich. App. 564, 568 (1991); *Hage* v. *Stade,* 304 N.W.2d 283, 285-286 (Minn. 1981); *State* v. *Sanders,* 756 S.W.2d 536, 538 (Mo. 1988); *Frye* v. *Clark County,* 97 Nev. 632, 633 (1981); *Hartman* v. *Hooksett,* 125 N.H. 34, 36 (1984); *O'Connor* v. *City of New York,* 58 N.Y.2d 184, 189-190 (1983); *Braswell* v. *Braswell,* 330 N.C. 363, 370-371 (1991); *Commerce & Indus. Ins. Co.* v. *Toledo,* 45 Ohio St. 3d 96, 99-101 (1989); *Melendez* v. *Philadelphia,* 320 Pa. Super. 59, 64 (1983); *Barratt* v. *Burlingham,* 492 A.2d 1219, 1221-1222 (R.I. 1985); *Bellamy* v. *Brown,* 305 S.C. 291, 294 (1991); *Rollins* v. *Petersen,* 813 P.2d 1156, 1162 (Utah 1991); *Mull* v. *Bellevue,* 64 Wash. App. 245, 250- 251 (1992); *Randall* v. *Fairmont City Police Dep't,* 186 W. Va. 336, 346-347 (1991).

by a public employee's failure to act in response to a situation the employee did not create, but also establishes a reasonable balance between competing values: the compensation of injured individuals and the protection of government from financial burdens of such magnitude as to threaten its ability to function." *Cyran* v. *Ware, supra* at 463 (O'Connor, J., concurring). As Justice Greaney said in *Cyran, supra* at 465, "[s]ociety would not favor, and public policy does not support, a rule which would expose a municipality to liability for damages every time its fire department does not, in a plaintiff's view, fight a fire satisfactorily. In busy urban areas such exposure could be limitless, and in extreme circumstances (as recent events in Los Angeles illustrate), the potential cost of such governmental liability could be catastrophic." In view of the announcement today of an intention "to abolish the public duty rule at the first available opportunity after the conclusion of the 1993 session of the Legislature," *ante* at 499, the threat of catastrophic governmental liability about which Justice Greaney wrote is very much a reality.

The Chief Justice states, *ante* at 507, that the formulation of the traditional public duty rule as I expressed it in my concurring opinion in *Cyran* v. *Ware, supra* at 467, "apparently relies either on a distinction between acts and omissions, or a distinction between misfeasance and nonfeasance." Let there be no question about it. The traditional public duty rule does make such a distinction, see, e.g., *Brennen* v. *Eugene*, 285 Or. 401, 409 (1979), and, despite the Chief Justice's assertion to the contrary, *ante* at 507, the distinction is entirely consistent with the Massachusetts Tort Claims Act. I discuss that subject in more detail later in this opinion.

The Chief Justice implies that any attempt to distinguish between acts and omissions is unworkable. Both *Cyran* v. *Ware, supra*, and *Mamulski* v. *Easthampton*, 410 Mass. 28 (1991), the Chief Justice says, *ante* at 507, "can be characterized easily either as cases of misfeasance or nonfeasance." The Chief Justice is incorrect. There was no suggestion in *Cyran* that the firefighters did anything that caused or inten-

sified the fire in the plaintiffs' building. Rather, the plaintiffs' claim was that the fire fighters did nothing to extinguish a fire that the defendants had neither originated nor aggravated. See *Cyran* v. *Ware, supra* at 469 & n.1 (Wilkins, J., dissenting, with whom Abrams, J., joined). In *Mamulski*, on the other hand, the defendant town maintained public ways on which motorists were invited to travel. The town held out the roads to be reasonably safe. The court held that the town owed such travelers a duty to exercise reasonable care for their safety in the same way that a private owner of property would owe a similar duty to invitees and licensees. *Id.* at 29-30. It cannot be said that a town that maintains roads for public use is in the position of one who, as was alleged against the defendants in *Cyran*, has simply failed to act.

The distinction between acts and omissions in tort law is of long duration. The Restatement (Second) of Torts § 314 (1965), states: "The fact that [a private person] realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Section 315, Comment b, at 123, states that, in the absence of the special relation identified in that section, a person "is not subject to liability if he fails, either intentionally or through inadvertence, to exercise his ability so to control the actions of third persons as to protect another from even the most serious harm. This is true although [the person] realizes that he has the ability to control the conduct of a third person, and could do so with only the most trivial of efforts and without any inconvenience to himself. Thus if [a person] is riding in a third person's car merely as a guest, he is not subject to liability to another run over by the car even though he knows of the other's danger and knows that the driver is not aware of it, and knows that by a mere word, recalling the driver's attention to the road, he would give the driver an opportunity to stop the car before the other is run over." *Black* v. *New York, N.H. & H.R.R.*, 193 Mass. 448 (1907), cited by the Chief Justice, *ante* at 508, makes the point. In that case, the plaintiff, an intoxicated passenger on the defendant's train, incapable of stand-

ing or walking or caring for himself, received assistance from
the defendant's employees, who, knowing his condition, took
him partway up a stairway and left him. A moment later the
plaintiff fell down the stairs and was injured. *Id.* at 449. The
court held that the employees "were under no obligation to
remove [the plaintiff] from the car, or to provide for his
safety after he left the car. But they voluntarily undertook to
help him from the car, and they were bound to use ordinary
care in what they did that might affect his safety." *Id.* at
450. The *Black* case and others demonstrate that for nearly
ninety years the court has been distinguishing between a de-
fendant's acts and omissions in determining whether a duty
of care exists, violation of which constitutes negligence. See
*O'Gorman* v. *Antonio Rubinaccio & Sons*, 408 Mass. 758,
762 (1990); *Mullins* v. *Pine Manor College*, 389 Mass. 47,
52 (1983); *Ballou* v. *Boston & Me. R.R.*, 341 Mass. 696,
699 (1961).

In the ordinary course, the court, not the Legislature, de-
termines as a matter of common law the circumstances in
which a legal duty of reasonable care shall be owed by one
person to another. That determination is made in the light of
existing social values and customs and appropriate public
policy. *Schofield* v. *Merrill*, 386 Mass. 244, 246-247 (1982).
The Chief Justice says, however, that the Massachusetts Tort
Claims Act, G. L. c. 258, requires it to abandon any "rule"
it may have established and to reject the traditional public
duty rule which I advocate. *Ante* at 506-507. One might rea-
sonably wonder how that interpretation of the Act escaped
the court's attention until now. The answer, I suggest, is that
the Act never has mandated, and it does not now mandate,
the result freely chosen by a majority of the Justices today.
Indeed, if the Justices are truly convinced that the Act man-
dates abandonment of the public duty "rule" previously es-
tablished by the court, and rejection of the traditional public
duty rule, how can delay in that regard be justified until af-
ter the conclusion of the 1993 session of the Legislature?

This court has held in several cases that, in the circum-
stances there present, the public employees, who were re-

quired by the terms of their employment to prevent or diminish harmful consequences to the public of conditions or situations not originally caused by the employees, did not owe to individual members of the public a legal duty commensurate with their duty to the public as a whole. See, e.g., *Appleton* v. *Hudson*, 397 Mass. 812 (1986); *Nickerson* v. *Commonwealth*, 397 Mass. 476 (1986); *Ribeiro* v. *Granby*, 395 Mass. 608 (1985). However, now a majority effectively holds that, pursuant to the Massachusetts Tort Claims Act, public employees in the circumstances present in those cases will indeed owe duties to individual members of the public, violation of which, when there is resulting injury, results in public employer liability. The Act, according to the majority, creates the duty and thus the tort, and the majority is bound by that, or at least will be bound by it after the 1993 session of the Legislature concludes. Whatever happened to the notion, expressed by the present Chief Justice, writing for the court in *Gallant* v. *Worcester*, 383 Mass. 707, 711 (1981), that, by enacting G. L. c. 258, "[t]he Legislature did not . . . intend to establish new or enlarged bases of tort liability"? See also *Dinsky* v. *Framingham*, 386 Mass. 801, 804 (1982) (Act "did not create any new theory of liability for a municipality").

General Laws c. 258, § 2 (1990 ed.), provides that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances . . . ." The Act does not purport to define negligence, which implies a legally imposed duty to exercise reasonable care, see *Theriault* v. *Pierce*, 307 Mass. 532, 533 (1940); *Altman* v. *Aronson*, 231 Mass. 588, 591 (1991), or to establish duties, or to declare what acts or omissions may be "wrongful." The Act simply limits preexisting governmental immunity so that public employers, having lost their preexisting exemption, are ordinarily liable in the same circumstances that would result in private employer liability. In the

absence of a "special relationship" of the kind contemplated by the traditional public duty rule, this court has never held that a private party is liable in tort for failing to prevent or diminish harm due to a condition or situation that the private party did not create, and nothing in the Act provides that a public employee or public employer is subject to a different rule.

The Chief Justice states, *ante* at 511 n.13, that my belief that today's decision creates new duties and new torts is a misperception on my part. There is no misperception. Apart from possible legislative intervention, if cases identical to *Cyran* v. *Ware, supra, Appleton* v. *Hudson, supra, Nickerson* v. *Commonwealth, supra,* and *Ribeiro* v. *Granby, supra,* should come before the court after the conclusion of the 1993 session of the Legislature, will not the present decision require that those cases be decided favorably to the plaintiffs, not favorably to the defendants as before, in the absence of countervailing legislation? The Chief Justice states, "By refusing to recognize the public duty rule as a bar to liability, we shall merely prevent a public entity from being treated differently from a private person *in like circumstances*" (emphasis in original). None of the Justices has cited a single case in which, in the absence of a special relationship of the kind contemplated by the traditional public duty rule, a private individual has been held liable in tort for failing to act in response to a situation he did not create. Rather, the court has held the opposite. See *Black* v. *New York, N.H. & H.R.R., supra,* and its progeny. Today, the court does not treat public entities in the same way that private persons are treated in like circumstances. Such a result certainly is neither sound public policy nor required by G. L. c. 258, the Massachusetts Tort Claims Act.


GREANEY, J. (concurring). I join in the Chief Justice's opinion principally because the abandonment of the public duty rule is made prospective. I am not persuaded by Justice O'Connor's opinion that we should immediately return to a

restricted special relationship exception to the public duty rule which would import back into the law many of the injustices associated with sovereign immunity. At the same time, I find an analysis that attempts to draw comparisons between public activities and hypothetically similar private activities far from intellectually convincing. There are no private fire fighting companies, building inspectors, or police departments, and it is by no means clear that the language of § 2 of G. L. c. 258 requires that such private entities be hypothesized in order effectively and fairly to apply and administer the statute.

From my point of view, the prospective nature of the opinion recognizes that abandonment of the public duty rule could lead to a deluge of lawsuits against governmental entities, particularly municipalities, which will drain their already limited resources. As I said in *Cyran* v. *Ware*, 413 Mass. 452, 455 (1992), for example, "[s]ociety would not favor, and public policy does not support, a rule which would expose a municipality to liability for damages every time its fire department does not, in a plaintiff's view, fight a fire satisfactorily. In busy urban areas such exposure could be limitless, and in extreme circumstances (as recent events in Los Angeles illustrate), the potential cost of such governmental liability could be catastrophic." In addition to damages, governmental entities will incur considerable costs to defend the lawsuits. Most of the suits will probably survive summary judgment (since causation, the issue which will be at the heart of most G. L. c. 258 actions under the new rule, is almost always a question of fact). The costs of defense thus will encompass fees and expenses for discovery, which in present lawsuits is often lengthy and costly, and fees for trial and appeals. The costs could have severe impact on public treasuries. I am not persuaded that the Legislature either intended or anticipated this result when G. L. c. 258 was enacted.

The period given to the Legislature to appraise the scope of G. L. c. 258 in light of today's decision will permit governmental entities to be heard and public policy to be evaluated.

Additionally, our past decisions which disclose the expansive, and at times unusual, nature of claims that can be brought under the present statute provide a basis for legislative consideration of the scope of the statute. I am also not persuaded that the Legislature intended that government liability be claimed every time some nondiscretionary action (or inaction) by a governmental employee has allegedly caused a plaintiff's injury. It may well be that the Legislature will impose limitations which preclude liability for such things as negligent inspections, negligence in fire fighting, and negligence in some aspects of police work. Other limitations may also be appropriate. Thus, the opportunity for legislative reflection on a statute which has up to now posed difficult problems of judicial interpretation and application persuades me to join in a result which, if it does become effective, will likely lead to equally difficult problems in the area of causation.