UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1962

DEBRA HORTA,

Plaintiff, Appellant,

v.

CHARLES B. SULLIVAN, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. A. David Mazzone, U.S. District Judge]

Before

Torruella, Circuit Judge,

Campbell, Senior Circuit Judge,

and Stahl, Circuit Judge.

Sheila M. Tierney with whom Tierney Law Office was on brief for
appellant.
Linda M. Walsh with whom Kroll & Tract was on brief for appellees
Charles B. Sullivan, Paul G. Sadeck, Edward Mello and the Town of
Freetown.
James F. Gettens with whom Healy & Rocheleau, P.C. was on brief
for appellees Jeffrey Mennino, James K. Bowles, and the Town of
Lakeville.

August 31, 1993


CAMPBELL, Senior Circuit Judge. A passenger

injured after police officers had chased the motorcycle on

which she was riding sued the police officers, the towns, and

the town police chiefs in the district court under 42 U.S.C.

1983 and state law. The district court granted summary

judgment for all defendants on all counts. Appellant

appeals, but only as to the 1983 claims against the police

officers and the pendent Massachusetts Tort Claims Act claims

against the two towns. We affirm in part, vacate and remand

in part, and certify a question of law to the Massachusetts

Supreme Judicial Court.

I. I.

The following facts are not in dispute. On Friday,

August 5, 1988, at approximately 9:18 p.m., appellee Jeffrey

Meninno, a Lakeville Police Officer, was traveling in his

police cruiser north on County Road in Lakeville,

Massachusetts, when he observed a motorcycle approaching him

in the southbound lane in excess of the posted speed limit.1

Officer Meninno activated the cruiser's blue lights as the

motorcycle approached. He then turned his cruiser around and



1. Officer Meninno stated that his radar gun, which he was
operating as he drove along County Road, measured the
motorcycle's speed as 59 miles per hour. The posted speed
limit on County Road was 40 miles per hour. A photograph of
the radar gun, showing a reading of 59 miles per hour, was
attached as an exhibit to Meninno's deposition.

-2-

began to pursue the motorcycle. Instead of pulling over,

the motorcycle accelerated.

When appellant Debra Horta, riding on the back of

the motorcycle, realized that the police car was following

them, she told the motorcycle operator, James F.

Demoranville, to stop because "it isn't worth it."

Demoranville refused. "He just said to tuck my head in

between his shoulders and hang on." Appellant remembers

nothing about what occurred after that moment.

Officer Meninno accelerated to keep up and followed

the motorcycle along County Road from a distance of a few

hundred feet, backing off a number of times when it appeared

that the bike was wobbling and the riders might fall off.

The chase reached speeds of seventy-five to eighty miles per

hour, as Meninno watched the motorcycle drive erratically,

pass at least one car, and swerve into and drive in the

opposite lane. Meninno unsuccessfully attempted to record

the motorcycle's license plate number.

As the pursuit continued on County Road, Officer

Meninno radioed a report to the Lakeville police dispatcher,

telling her of the pursuit and asking her to notify the

police department in the neighboring town of Freetown that

the motorcycle was heading toward the Lakeville-Freetown

line. Appellee Charles B. Sullivan, a police officer in

Freetown, heard Meninno's transmission but did not yet

-3-

contact Lakeville. At that time Sullivan and appellee Paul

G. Sadeck, another Freetown police officer, were parked in

separate cruisers on Route 18 in Freetown. Sullivan told

Sadeck about the chase and then drove south on Route 18

toward the intersection of Route 18 and Mason Road. Mason

Road runs between County Road and Route 18. Meninno

contacted the Lakeville dispatcher again, notifying her that

the motorcycle had left Lakeville and entered Freetown.

Sullivan then informed the Lakeville dispatcher and Meninno

that the Freetown police would assist. The motorcycle slowed

down to thirty miles per hour, with Meninno doing the same,

before turning left from County Road onto Mason Road and

accelerating again to over sixty miles per hour.2 Officer

Meninno kept up and told Sullivan by radio that he and the

motorcycle were now proceeding eastbound on Mason Road. He

also warned Sullivan that, "He's driving recklessly. Be

careful." Sullivan informed Meninno that he was now coming

in the other direction on Mason Road, getting closer to

Meninno and the speeding motorcycle.



2. Mason Road is a paved, two-lane road approximately 24
feet wide with a double solid yellow line separating the
lanes and a posted speed limit of 30 miles per hour. The
segments of County Road and Mason Road on which the pursuit
took place are sparsely populated residential and undeveloped
areas. That evening, Mason Road was dry and traffic was
light.

-4-

As the motorcycle and Meninno continued east on

Mason Road, Officer Sullivan stopped his police cruiser in

the eastbound lane of the two-lane road, facing west. He

left the transmission in Drive and "stood on the brakes" to

keep the cruiser stationary. The westbound lane directly

next to Sullivan's cruiser was unobstructed.3 In front of

the cruiser, the road ran straight for approximately 480 feet

before it turned. Sullivan could not see around the bend to

the approaching motorcycle and police car, nor could the

latter yet see his car. Sullivan illuminated the cruiser's

blue lights, take-down lights,4 and headlights. No

streetlight illuminated the point at which the cruiser was

parked, but the road was lit at the bend and the take-down

lights illuminated part of the road in front of the cruiser.

Officer Meninno and the motorcycle were traveling

along Mason Road at sixty or sixty-five miles per hour when

Officer Sullivan advised Meninno by radio of his precise



3. Officer Sadeck, in another cruiser, was heading for Mason
Road at this time but did not arrive on the scene until after
the crash. While appellant alleged in her complaint that
Sadeck arrived prior to the crash and that his cruiser formed
part of a "staggered roadblock," there is no admissible
evidence in the record supporting this allegation. See infra
Part II.

4. Take-down lights are small white lights affixed to the
roof of the police cruiser and located in between two sets of
flashing blue lights. The take-down lights on Officer
Sullivan's cruiser were directed toward the front of the
cruiser and illuminated a portion of the area in front of the
car.

-5-

location, warned him to "back off" and that he had the road

"blocked." Meninno says that he did slow down, but the

motorcycle continued on apace.

Fifteen to twenty seconds elapsed before Sullivan

saw the motorcycle, with Demoranville and appellant on it,

round the bend in Mason Road with Meninno's cruiser some

distance behind it.5 Demoranville, still driving in the

eastbound lane, appeared to slow the cycle down and steer

toward the roadside on his right. However, he apparently

lost control of the motorcycle, which fell on its side and

slid along the roadway until it collided with the front of

Officer Sullivan's stationary police cruiser. The cruiser

rose up in the air on impact, Demoranville became wedged

underneath the car, and appellant Horta fell backwards off

the motorcycle. Meninno eventually stopped without skidding

or taking evasive action. Demoranville died within the hour

and Horta sustained serious, permanent injuries, resulting in

a month-long coma and eventual amputation of her left leg.

Three to four minutes elapsed from the time Officer

Meninno began the pursuit to the time the motorcycle collided

with Sullivan's cruiser. The pursuit covered 3.2 miles. At



5. Meninno stated in his deposition that he was
approximately 250 feet behind the motorcycle when he rounded
the turn. Sullivan estimated only that the distance was "no
less than" 50 to 75 feet. The evidence is unclear as to how
fast the motorcycle was going when it rounded the last bend
on Mason Road.

-6-

no time did Officer Meninno's police cruiser make physical

contact with the motorcycle or its passengers.6

Appellant Horta brought this civil action for money

damages on June 25, 1991, in the United States District Court

for the District of Massachusetts against seven defendants

Officers Meninno, Sullivan, and Sadeck; the Town of Lakeville

and the Town of Freetown; and Lakeville Police Chief James K.

Bowles and Freetown Police Chief Edward Mello. The complaint

contained six counts, alleging that Meninno, Sullivan, and

Sadeck were liable to Horta under 42 U.S.C. 1983 and 1985

for violation of her constitutional rights (Count I); under

Mass. Gen. L. ch. 12, 11H and I for violation of her civil

rights (Count II); and under the Massachusetts Tort Claims

Act, Mass. Gen. L. ch. 258, for negligence (Count III).

Horta also alleged that the towns of Lakeville and Freetown

were liable to her under the Massachusetts Tort Claims Act

for the negligent actions of Meninno, Sullivan, and Sadeck

(Count IV), and that Chief Bowles, Chief Mello, Lakeville and

Freetown were liable to her under 42 U.S.C. 1983, 1985 and

1988 (Count V) and under Mass. Gen. L. 11H and I (Count

VI).



6. It is undisputed that no non-police vehicles or
pedestrians were on Mason Road near the accident scene at the
time of the collision.

-7-

The defendants moved for summary judgment, which

the district court granted on July 8, 1992.7 Horta now

appeals from the final judgment dismissing her complaint.



7. The district court separately granted Meninno's motion
for judgment on the pleadings as to Count III. Appellant
filed no opposition to the motion and does not appeal from
that portion of the district court's order.

-8-

II. II.

Horta challenges only the district court's granting

of summary judgment on Counts I and IV, hence waiving any

appeal concerning Counts II, III, V and VI. See Fed. R. App.

P. 28(a)(3), (5); Brown v. Trustees of Boston Univ., 891 F.2d

337, 352 (1st Cir. 1989), cert. denied, 496 U.S. 937 (1990).

We turn first to a disagreement over what materials

are properly in the summary judgment record. Appellees moved

in the district court to strike seven exhibits two

affidavits, three newspaper articles and other documents

that Horta submitted with her opposition to the motion for

summary judgment. Appellees argued, inter alia, that the

exhibits contained inadmissible hearsay, were not in proper

form, and were not properly sworn to or certified under Fed.

R. Civ. P. 56. The district court denied the motion to

strike without comment. Appellees now assert that we should

disregard the exhibits for purposes of deciding, in this

appeal, whether or not to uphold summary judgment. See Carey

v. Bahama Cruise Lines, 864 F.2d 201, 203 n.1 (1st Cir. 1988)

("An appellee need not cross-appeal 'to argue that there are

alternative grounds that support the judgment below.'"

(quoting Jasany v. United States Postal Serv., 755 F.2d 1244,

1248 n.1 (6th Cir. 1985))).

Summary judgment is to be decided on "the

pleadings, depositions, answers to interrogatories, and

-9-

admissions on file, together with the affidavits, if any."

Fed. R. Civ. P. 56(c). In addition, a court may take into

account any material that would be admissible or usable at

trial. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay

Kane, Federal Practice and Procedure 2721, at 40 (2d ed.

1983). However, inadmissible evidence may not be considered.

Finn v. Consolidated Rail Corp., 782 F.2d 13, 16-17 (1st Cir.

1986). "Mere allegations, or conjecture unsupported in the

record, are insufficient to raise a genuine issue of material

fact." August v. Offices Unlimited, Inc., 981 F.2d 576, 580

(1st Cir. 1992).

We need consider only one of the challenged

exhibits as none of the others, even if admissible, would add

to or subtract from Horta's ability to raise a genuine issue

of material fact. The significant exhibit is a photocopy of

a newspaper article indicating that Officer Sadeck's cruiser

had arrived on the scene before the crash and was so

positioned with Officer Sullivan's cruiser as to form a

"staggered roadblock." This account is contrary to all the

other reports before the court. Sadeck stated in his own

affidavit that he was on Route 18, not on Mason Road (where

the crash occurred) when he saw smoke coming from the front

of Officer Sullivan's cruiser and heard Sullivan report the

collision to the Freetown dispatcher. Officer Sadeck says

that he immediately drove down Mason Road and parked his

-10-

cruiser in the westbound lane approximately 150 feet behind

Officer Sullivan's cruiser, which was in the eastbound lane.

He exited his car, saw two injured persons on the ground and

ran back to his cruiser to summon an ambulance and obtain

first aid equipment. Officers Meninno and Sullivan

corroborate Sadeck's story, stating that they did not see

Officer Sadeck on the scene until after the collision.

Freetown Police Chief Mello's affidavit states that an

official investigation of the incident turned up no evidence

that Officer Sadeck was on Mason Road before the collision

occurred.

Appellant alleged in her complaint that Officer

Sadeck was on Mason Road before the collision, and had parked

his vehicle in the westbound lane, 150 feet behind Officer

Sullivan's cruiser in the eastbound lane, to establish with

Sullivan a staggered roadblock. The newspaper article

offered in support of this appeared two days after the

accident. It reports Freetown Police Chief Mello as stating

that two Freetown police vehicles were positioned on Mason

Road to create a staggered roadblock.8 No affidavits or



8. The unidentified reporter wrote, in part:

James F. Demoranville, 40, died of
multiple injuries at St. Luke's Hospital
in New Bedford at 10 p.m., about 45
minutes after he lost control of his
motorcycle and slid into one of 2 police
cruisers poised to slow him down. . . .

-11-

depositions from the unidentified newspaper reporter or

reporters were submitted to the court.

This article should have been stricken on

appellees' motion and cannot be considered in deciding

whether Horta has raised a genuine issue of material fact.

See Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir.

1990); Bolen v. Paragon Plastics, Inc., 754 F. Supp. 221,

224-25 (D. Mass. 1990). The account is hearsay, inadmissible

at trial to establish the truth of the reported facts. In

fact, the newspaper account is hearsay within hearsay. See

Fed. R. Evid. 805. Even were appellee Chief Mello the sole

source of the article's information, so that his statements

could be regarded as the nonhearsay admissions of a party

opponent, see Fed. R. Evid. 801(d)(2), the article itself

constitutes inadmissible out-of-court statements, by

unidentified persons, offered to prove the truth of the



[] Freetown police set up a partial
road block by staggering two cruisers
along the road, according to Police Chief
Edward Mello. The staggered road block
is designed to slow down speeding
vehicles, leaving an opening for the
vehicle to continue driving, he said.

Mr. DeMoranville did slow his
motorcycle but lost control of it as he
tried to avoid hitting a cruiser,
according to reports. The motorcycle and
its passengers then slid into the front
end of one of the cruisers.

Chase Ends in Death, New Bedford (Mass.) Sunday Standard-
Times, Aug. 7, 1988.

-12-

matter asserted. See Fed. R. Evid. 801(c); New England Mut.

Life Ins. Co. v. Anderson, 888 F.2d 646, 650-51 (10th Cir.

1989). Such inadmissible material is not a proper part of

the record for summary judgment purposes. See, e.g.,

Garside, 895 F.2d at 50 (refusing to consider, on summary

judgment motion, an interrogatory answer describing the

anticipated testimony of an expert because it contained

inadmissible hearsay); FDIC v. Roldan Fonseca, 795 F.2d 1102,

1110 (1st Cir. 1986) (refusing to consider on summary

judgment photocopies of three money orders offered to show

amount paid on a note because they were inadmissible

hearsay). Accordingly, the newspaper article may not be

regarded in determining whether a genuine issue of material

fact exists.

III. III.

Appellant alleged in Count I that Officers Sadeck,

Meninno, and Sullivan were liable to her under 42 U.S.C.

1983 because they deprived her of her constitutional right

under the Fourth Amendment to be free from unreasonable

seizures.9 In granting summary judgment for appellees, the



9. The Fourth Amendment to the United States Constitution
provides:

The right of the people to be secure
in their persons, houses, papers, and
effects, against unreasonable searches
and seizures, shall not be violated, and
no Warrants shall issue, but upon
probable cause, supported by Oath or

-13-

district court ruled that all three were entitled to

qualified immunity. We affirm, although on different grounds

as to Sadeck and Meninno. See Aunyx Corp. v. Canon U.S.A.,

Inc., 978 F.2d 3, 6 (1st Cir. 1992) ("We are free, on appeal,

to affirm a judgment on any independently sufficient ground."

(citations omitted)), cert. denied, 113 S. Ct. 1416 (1993).

A. Officer Sadeck  A. Officer Sadeck



affirmation, and particularly describing
the place to be searched, and the person
or things to be seized.

42 U.S.C. 1983 provides in relevant part:

Every person who, under color of any
statute, ordinance, regulation, custom,
or usage, of any State or Territory or
the District of Columbia, subjects, or
causes to be subjected, any citizen of
the United States or other person within
the jurisdiction thereof to the
deprivation of any rights, privileges, or
immunities secured by the Constitution
and laws, shall be liable to the party
injured in an action at law, suit in
equity, or other proper proceeding for
redress. . . .

Appellant also alleged in Count I that Sadeck,
Meninno, and Sullivan were liable under 42 U.S.C. 1985.
However, the 1985 claims were never discussed below, either
by the parties or the court, and the record does not support
a 1985 claim. See United Bhd. of Carpenters v. Scott, 463
U.S. 825, 834-37 (1983) (reaffirming that 1985 requires a
showing of some racial, or perhaps otherwise class-based,
animus behind the conspirators' actions); Griffin v.
Breckenridge, 403 U.S. 88, 102-03 (1971) (explaining elements
of a claim under 1985(3)). Hence, we consider Count I to
include claims only under 1983.

-14-

Appellant's claim against Sadeck is based entirely

on the allegation that he parked his vehicle on Mason Road

before the collision, helping Officer Sullivan to create a

staggered roadblock which led to appellant's injuries. The

undisputed facts on the record show that Officer Sadeck did

not arrive on Mason Road until after the accident and,

therefore, was not causally connected to the injuries

sustained by appellant. Consequently, Sadeck was entitled to

judgment as a matter of law on the 1983 claim against him.

See Lossman v. Pekarske, 707 F.2d 288, 291 (7th Cir. 1983)

("[T]he principles of tort causation apply to constitutional

as to other tort suits.").

B. Officer Meninno  B. Officer Meninno

We do not reach qualified immunity, the ground upon

which the court below dismissed the 1983 claim against

Officer Meninno. Rather, we find that Meninno is entitled to

prevail as a matter of law because his conduct, construed in

the light most favorable to appellant, could not have

constituted a "seizure" of her person within the meaning of

the Fourth Amendment.

The Supreme Court, in Brower v. County of Inyo, 489

U.S. 593 (1989), clarified the scope of the Fourth Amendment

in the context of police pursuits and roadblocks.

Violation of the Fourth Amendment
requires an intentional acquisition of
physical control. A seizure occurs even
when an unintended person or thing is the

-15-

object of the detention or taking, but
the detention or taking must be willful.
This is implicit in the word "seizure,"
which can hardly be applied to an
unknowing act. . . . In sum, the Fourth
Amendment addresses "misuse of power,"
not the accidental effects of otherwise
lawful government conduct.
Thus, if a parked and unoccupied
police car slips its brake and pins a
passerby against a wall, it is likely
that a tort has occurred, but not a
violation of the Fourth Amendment. And
the situation would not change if the
passerby happened, by lucky chance, to be
a serial murderer for whom there was an
outstanding arrest warrant even if, at
the time he was thus pinned, he was in
the process of running away from two
pursuing constables. It is clear, in
other words, that a Fourth Amendment
seizure does not occur whenever there is
a governmentally caused termination of an
individual's freedom of movement (the
innocent passerby), nor even whenever
there is a governmentally caused and
governmentally desired termination of an
individual's freedom of movement (the
fleeing felon), but only when there is a
governmental termination of freedom of
movement through means intentionally
applied. That is the reason there was no
seizure in the hypothetical situation
that concerned the Court of Appeals.
[I.e., a police chase in which the
suspect unexpectedly loses control of his
car and crashes.] The pursuing police
car sought to stop the suspect only by
the show of authority represented by
flashing lights and continuing pursuit;
and though he was in fact stopped, he was
stopped by a different means his loss
of control of his vehicle and the
subsequent crash. If, instead of that,
the police cruiser had pulled alongside
the fleeing car and sideswiped it,
producing the crash, then the termination
of the suspect's freedom of movement
would have been a seizure.

-16-

Id. at 596-97 (citations omitted) (emphasis in original).

Applying the Court's reasoning in Brower to the

present facts, it is clear that Officer Meninno's pursuit of

the motorcycle on which Horta was riding, without more, was

not a Fourth Amendment seizure. "A Fourth Amendment seizure

does not occur when a police officer turns on his blue lights

and thereby signals the driver of a vehicle to pull over."

Willhauck v. Halpin, 953 F.2d 689, 716 (1st Cir. 1991). If

the driver speeds off, pursued by the officer, and a crash

ensues, this does not necessarily constitute a seizure,

either. Hence, if during the chase here Demoranville's

motorcycle had accidentally collided with a tree on Mason

Road there would plainly have been no seizure, as Meninno

would not have terminated Horta's "freedom of movement

through means intentionally applied," (i.e., Meninno did not

intentionally cause the motorcycle to strike the tree).

Brower, 489 U.S. at 597; see, e.g., Campbell v. White, 916

F.2d 421, 423 (7th Cir. 1990) (holding no seizure occurred

where police officer accidentally collided with motorcyclist

being pursued), cert. denied, 111 S. Ct. 1314 (1991); Apodaca

v. Rio Arriba County Sheriff's Dept., 905 F.2d 1445, 1447

(10th Cir. 1990) (holding no seizure occurred where police

officer responding to burglar alarm unintentionally collided

with bystander's vehicle); Roach v. City of Fredericktown,

882 F.2d 294, 296 (8th Cir. 1989) (holding no seizure

-17-

occurred where police officer did not intend pursuit to end

by means of a collision with another vehicle).

By the same token, it is not sufficient that

Meninno pursued and the pursuit resulted in a collision with

another police vehicle. Even if Officer Sullivan's

independent conduct in blocking the lane were deemed to be a

Fourth Amendment seizure, see infra Part III.C., Officer

Meninno did not necessarily share responsibility. "The

Supreme Court in Brower carefully distinguished between

police action directed toward producing a particular result

in Fourth Amendment parlance, 'an intentional acquisition

of physical control' and police action that simply causes

a particular result. Unless the restraint of liberty at

issue resulted from an attempt to gain control of the

individual, the Court stated, there has been no Fourth

Amendment seizure." Landol-Rivera v. Cruz Cosme, 906 F.2d

791, 795 (1st Cir. 1990) (emphasis in original). To

establish that Meninno seized her, appellant must show that

the collision with Officer Sullivan's cruiser was the means

intended by Meninno to end the pursuit. 

Reading the record in the light most favorable to

appellant, there is no basis for a jury to find that a

collision between the motorcycle and another police vehicle

was the means intended by Meninno to terminate the pursuit.

Meninno himself attempted to stop the motorcycle only by a

-18-

show of authority, i.e., his flashing lights and siren. He

did not request the Lakeville police to establish a partial

roadblock, nor is there anything to show that he contemplated

forcing the fleeing motorcycle into a collision.

Appellant asserts that Meninno intentionally

brought about the collision by "herding" the motorcycle into

Sullivan's cruiser. But Meninno's cruiser did not touch the

motorcycle; he consistently matched his speed to that of the

motorcycle and maintained a distance of a few hundred feet

behind. Demoranville slowed down (to thirty miles per hour)

and sped up (to seventy-five miles per hour) a number of

times during the chase. Nothing prevented the motorcycle

operator from slowing down and stopping had he so desired.

It was Demoranville, not Meninno, who elected to head into

Freetown and to turn onto Mason Road.

Meninno, moreover, never proposed nor discussed

with anyone the idea of blocking the traffic lane. Officer

Sullivan volunteered his assistance, and Officer Meninno,

though in radio contact with Sullivan, had no authority over

him. Sullivan's decision to park his car in the oncoming

traffic lane of Mason Road was made independently and, until

just before the crash, without Meninno's knowledge. Meninno

was first informed, by radio, of the partial roadblock when

Officer Sullivan told him to "back off," approximately

-19-

fifteen seconds before the collision. Meninno said that he

did slow down, although the motorcycle kept going.

We hold that appellant did not produce facts

creating a genuine issue as to whether the motorcycle-police

cruiser collision was the means intended by Officer Meninno

to terminate appellant's freedom of movement.10 Appellee

Meninno was entitled to summary judgment on Count I.

C. Officer Sullivan  C. Officer Sullivan

The district court found appellee Sullivan to be

protected by qualified immunity from appellant's 1983

claim.

Appellant challenges the finding of qualified

immunity, first arguing that Sullivan was not engaged in a

"discretionary function" when he participated in the pursuit

of appellant and Demoranville. His actions were not

discretionary, she argues, because the Town of Freetown had

in effect high speed guidelines which governed his conduct.

In its landmark case establishing qualified

immunity doctrine, the Supreme Court indeed stated that

"government officials performing discretionary functions,

generally are shielded from liability for civil damages



10. We do not consider to what extent, if any, appellant's
claim of a Fourth Amendment seizure is weakened by her status
as a mere passenger on the motorcycle, not the motorcycle
operator being pursued by the police for violation of traffic
laws. See Landol-Rivera v. Cruz Cosme, 906 F.2d 791, 795-96
(1st Cir. 1990).

-20-

insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable

person would have known." Harlow v. Fitzgerald, 457 U.S.

800, 818 (1982) (emphasis supplied). But in spite of the

reference to discretionary functions, it has never since

been clear exactly what role, if any, this concept is

supposed to play in applying qualified immunity. Judge

Cummings, writing for the Seventh Circuit, warned that "it

would be unwise to engage in a case by case determination of

Section 1983 immunity based upon the ministerial versus

discretionary nature of the particular official act

challenged." Coleman v. Frantz, 754 F.2d 719, 727 (7th Cir.

1985). Judge Arnold, writing for the Eighth Circuit, said,

The distinction between ministerial and
discretionary duties of public officials
has a long history. However, the
plaintiffs have cited, and we can find,
no recent case other than that before us
in which a court has rejected qualified
immunity simply because the official in
question was performing a ministerial
duty.

McIntosh v. Weinberger, 810 F.2d 1411, 1432 (8th Cir. 1987)

(citations omitted), partially vacated and remanded on other

grounds sub nom. Turner v. McIntosh, 487 U.S. 1212 and cert.

denied, 487 U.S. 1217 (1988). See Gagne v. City of

Galveston, 805 F.2d 558, 559 (5th Cir. 1986) (holding that

officials do not lose qualified immunity merely because their

conduct violates some unambiguous statutory or administrative

-21-

provision), cert. denied, 483 U.S. 1021 (1987); see also F.E.

Trotter, Inc. v. Watkins, 869 F.2d 1312, 1314-15 (9th Cir.

1989); cf. Ricci v. Key Bancshares of Maine, Inc., 768 F.2d

456, 464 (1st Cir. 1985) ("[B]reaking down discretionary acts

. . . into discretionary and ministerial components would

seem to vitiate much of the protection of discretionary

action which absolute immunity was designed to provide.").

Since Harlow the Supreme Court has neither

repudiated nor much explained the role of discretionary

functions relative to qualified immunity. However, in Davis

v. Scherer, 468 U.S. 183 (1984), the Court rejected an

argument almost identical to the one put to us here.

Officials being sued for alleged constitutional violations

were accused of having ignored the commands of state

administrative regulations, and hence of violating a

ministerial rather than a discretionary duty. Id. at 193,

196 & n.14. Because of this, it was argued that they had

forfeited any claim to qualified immunity. In rejecting this

contention, the Court made two points: first, the officials

could lose their immunity only if the breach of the state

regulation rather than of a constitutional duty gave rise to

plaintiff's damages claim; and, second, the officials' duties

were not merely ministerial, as the officials retained a

considerable measure of personal discretion in applying the

administrative regulations. Id. at 196 & n.14.

-22-

The same factors bar appellant's claim here. The

damages claim in Count I is based on a purported Fourth

Amendment violation, not upon the breach of the Freetown high

speed pursuit guidelines. And the pursuit guidelines

required Sullivan to exercise discretion in their

interpretation.11

Generally, police exercise "inescapably

discretionary functions replete with close judgment calls."

Gooden v. Howard County, 954 F.2d 960, 964 (4th Cir. 1992)

(en banc). The promulgation by a police department of

general guidelines and standard procedures does not transform

police officers' discretionary actions into ministerial ones.

"A law that fails to specify the precise action that the

official must take in each instance creates only

discretionary authority . . . ." Davis v. Scherer, 468 U.S.

at 197 n.14. The Freetown guidelines, an eight-page

collection of rules and suggestions labeled "High Speed



11. Confusingly, appellant also argues at some points in her
brief that Freetown did not have guidelines in place, citing
three documents from Freetown public records which suggest
that a new set of high speed pursuit guidelines were adopted
in late 1988, after the collision. These documents, however,
are not inconsistent with the uncontradicted statements by
appellees Sullivan and Mello that written guidelines were in
effect on August 5, 1988.

It would weaken and not help appellant's position
were it to be found that no guidelines existed governing
Sullivan's actions. With no rules or regulations to guide
his decision making, Sullivan's decision to aid in the
pursuit and block off the lane would necessarily have been
discretionary.

-23-

Pursuit General Considerations and Guidelines," left

Sullivan with a substantial amount of discretion as to when

and how to conduct and terminate high speed pursuits.

We conclude that insofar as the concept of

discretionary function is relevant at all in the immunity

sphere, Sullivan was engaged in a discretionary function.

The more serious question under Harlow is whether

Sullivan violated a clearly established statutory or

constitutional right of which a reasonable police officer

would have known. The theory of appellant's 1983 claim is

that Sullivan violated her rights under the Fourth Amendment

to be free from unreasonable seizures by placing his police

car in the traffic lane in which he knew appellant and

Demoranville were traveling at high speed. Appellant argues

that a reasonable police officer would have known that, under

clearly established law, this sort of a partial roadblock was

unlawful.

Appellant has the burden of demonstrating that the

law on this issue was clearly established on August 5, 1988.

Davis, 468 U.S. at 197. For a right to be clearly

established, "[t]he contours of the right must be

sufficiently clear that a reasonable official would

understand that what he is doing violates that right."

Anderson v. Creighton, 483 U.S. 635, 640 (1987). While

appellant need not show that "the very action in question has

-24-

previously been held unlawful," she must show that, in the

light of preexisting law, the unlawfulness of the action

would have been apparent to the reasonable police officer.

Id. 

The Supreme Court required "any assessment as to

whether police conduct amounts to a seizure implicating the

Fourth Amendment . . . [to] take into account '"all of the

circumstances surrounding the incident"' in each individual

case." Michigan v. Chesternut, 486 U.S. 567, 572 (1988)

(citations omitted). There must be a balancing of "the

nature and quality of the intrusion on the individual's

Fourth Amendment interests against the importance of the

governmental interests alleged to justify the intrusion."

Tennessee v. Garner, 471 U.S. 1, 8 (1985) (citations

omitted). "[W]henever a balancing of interests is required,

the facts of the existing caselaw must closely correspond to

the contested action before the defendant official is subject

to liability under Harlow." Benson v. Allphin, 786 F.2d 268,

276 (7th Cir.), cert. denied, 479 U.S. 848 (1986); see Medina

v. City of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992);

Frazier v. Bailey, 957 F.2d 920, 931 (1st Cir. 1992).

Consequently, appellant here must demonstrate that, by the

time in question, there were fairly analogous precedents

establishing that Sullivan's conduct violated a plaintiff's

Fourth Amendment right to be free from unreasonable seizures.

-25-

The hodgepodge of cases cited by appellant12 show

the opposite: it was not at all clear at the time that

Sullivan's actions violated a person's Fourth Amendment

rights. As discussed below, Brower v. County of Inyo, 489

U.S. 593 (1989), holding that a total roadblock (i.e.,

tractor trailer placed broadside across entire road) was a

seizure, was not decided until seven months after the present

events had occurred. The strongest case decided prior to

this incident in appellant's favor was Jamieson v. Shaw, 772

F.2d 1205 (5th Cir. 1985), in which the plaintiff was

seriously injured when the car in which she was a passenger

struck a "deadman's" roadblock placed across a highway by

defendant police officers. Id. at 1206. "The roadblock

consisted of an unlighted police car parked laterally in the



12. We have considered all of the cases cited by appellant
and discuss only the ones which best support her argument
that Sullivan violated clearly established Fourth Amendment
rights.

Appellant cites one decision from Texas which found the
use of an unlit, total roadblock to stop speeding motorcycles
to be an unconstitutional excessive use of force. See City
of Amarillo v. Langley, 651 S.W.2d 906, 913-14 (Tex. Ct. App.
7th Dist. 1983). The Langley court did not discuss the
Fourth Amendment. As far as we can tell, appellant has not
alleged that Sullivan violated her substantive due process
rights to be free from excessive force. Even if she had, the
Supreme Court made clear in Graham v. Connor, 490 U.S. 386
(1989), that where "the excessive force claim arises in the
context of an arrest or investigatory stop of a free citizen,
it is most properly characterized as one invoking the
protections of the Fourth Amendment . . . ." Id. at 394; see
Landol-Rivera v. Cruz Cosme, 906 F.2d 791, 796 (1st Cir.
1990).

-26-

middle of the highway just over the crest of a hill. Just as

[the pursued] car, still traveling at a high rate of speed,

reached the top of the hill, [a police officer] flashed a

bright spotlight in [the driver's] eyes, blinding him

momentarily and causing him to lose control of the car and

crash into the roadblock." Id. at 1207. The Jamieson court

held that plaintiff's complaint stated a claim cognizable

under the Fourth Amendment, but did not resolve whether,

under the circumstances, the police officers' actions

actually constituted an unreasonable seizure. Id. at 1211;

see also Stanulonis v. Marzec, 649 F. Supp. 1536, 1545 (D.

Conn. 1986) (holding that creating "an immediate risk of a

collision" by placing police car in path of speeding vehicle

could constitute use of excessive force).

In direct contrast to Jamieson, the Ninth Circuit

decided in 1987 that such a total roadblock was not a Fourth

Amendment violation. See Brower v. County of Inyo, 817 F.2d

540 (9th Cir. 1987), rev'd, 489 U.S. 593 (1989). After

pursuing a suspect at high speeds for twenty miles, the

defendant police officers decided to create a roadblock to

stop him. Id., 817 F.2d at 542. A tractor-trailer truck was

placed across the highway to block both lanes of the two-lane

highway. Id. Plaintiffs alleged that the police concealed

the roadblock by placing it behind a curve and leaving it

unilluminated. Brower, 489 U.S. at 594. The police then

-27-

positioned a police car in front of the tractor trailer with

its headlights purposely aimed to blind the suspect as he

approached the unlit roadblock. Id.

The Ninth Circuit held that use of this roadblock

did not implicate the Fourth Amendment.

Although Brower was stopped in the
literal sense by his impact with the
roadblock, he was not 'seized' by the
police in the constitutional sense.
Prior to his failure to stop voluntarily,
his freedom of movement was never
arrested or restrained. He had a number
of opportunities to stop his automobile
prior to the impact.

An analogous situation arose in
Galas [v. McKee, 801 F.2d 200 (6th Cir.
1986)] where a police officer engaged in
a high-speed chase of a fleeing traffic
offender. The chase ended when the
fleeing driver lost control and crashed.
The question arose whether the crash was
a "seizure" under the fourth amendment.
The court concluded that there had been
no seizure by the police because the
officers had failed to impose restraint
on the individual's freedom to stop or
drive away. . . .

We agree with the Galas decision.
In this case, as the twenty-mile chase
makes plain, Brower consciously chose to
avoid official restraint. That decision,
an exercise of autonomy, cannot fairly be
viewed as a "seizure" by the police,
under the fourth amendment. Brower's
seizure, if any, was the result of his
own effort in avoiding numerous
opportunities to stop.

Brower, 817 F.2d at 546; see also Reed v. County of Allegan,

688 F. Supp. 1239, 1243 (W.D. Mich. 1988) (applying the Ninth

-28-

Circuit's Brower decision to hold that use of a roadblock did

not constitute a seizure).

The Supreme Court subsequently reversed the Ninth

Circuit's decision in Brower, holding that a "seizure" within

the meaning of the Fourth Amendment had occurred, and

remanded the case for a finding as to whether the seizure was

"unreasonable." Brower v. County of Inyo, 489 U.S. at 599-

600. However, as we have stated, the Supreme Court's

decision in Brower was issued in March of 1989, seven months

after the Mason Road incident.13

Where at the time of the present occurrence there

were conflicting circuit decisions as to whether or not even

the more deadly full roadblocks were unconstitutional,

Sullivan's parking of his illuminated cruiser in one lane of

a straightaway cannot be said to have violated clearly

established rights.

Appellant argues that it had been clearly

established in Tennessee v. Garner, 471 U.S. 1 (1985), that

the use of deadly force to seize an unarmed, nondangerous

suspect violates the Fourth Amendment, id. at 11. According

to appellant, a reasonable police officer would have

analogized the use of the present roadblock to the



13. Appellant suggests that a reasonable police officer
would have realized that the Ninth Circuit's decision in
Brower was incorrect because the Supreme Court had already
granted certiorari on August 5, 1988. Clairvoyance is not a
prerequisite for qualified immunity.

-29-

intentional shooting of a fleeing suspect. However,

Tennessee v. Garner applied only to "seizures" and it was not

yet clear that a stopping by a roadblock might, in

appropriate circumstances, be a seizure. Id. at 7; Brower,

817 F.2d at 546; Fernandez v. Leonard, 784 F.2d 1209, 1217

(1st Cir. 1986). Four years elapsed before the Supreme Court

held in Brower that a roadblock could be a "seizure." During

this period the Ninth Circuit rejected the argument that a

roadblock fell into the "seizure" category. See Brower, 817

F.2d at 546-47 (distinguishing Tennessee v. Garner on the

grounds that use of a roadblock is not a seizure). Nor was

it clear to all federal courts that a successful roadblock or

high speed pursuit ending in a crash constituted the "use of

deadly force." Compare Reed v. County of Allegan, 688 F.

Supp. at 1243 (holding that a roadblock does not constitute

use of deadly force) with Moyer v. Dunn County, 691 F. Supp.

164, 170-71 (W.D. Wis. 1988) (suggesting that high speed

pursuit of suspect resulting in collision with police car or

off-road crash could constitute use of deadly force).

As it stood at the time this tragic accident

occurred, the law was not so clear that a reasonable police

officer would know that establishing an illuminated, partial

roadblock at the end of a straightaway violated Fourth

Amendment rights. Because Sullivan did not violate a clearly

established right of appellant's, the district court

-30-

correctly found that he was entitled to qualified immunity

from a claim under 42 U.S.C. 1983.

In holding that Sullivan is entitled to qualified

immunity, we do not mean to imply that on the present

showing, there would otherwise necessarily be a triable issue

concerning whether or not this partial roadblock amounted to

a seizure under the Fourth Amendment. We need not reach that

question. It may be that the illuminated blocking of a

single lane at a point some distance from where the block

could be seen by the pursued vehicle would not amount to a

seizure. On the other hand, the converse can be argued. See

Brower, 489 U.S. at 598-99. We leave that issue for another

day. What is abundantly clear is that, on the law existing

at the time of the events in question, a reasonable police

officer would not have known that the partial block in

question violated the Fourth Amendment.

-31-

IV. IV.

In Count IV, appellant alleged that the Town of

Lakeville and Town of Freetown are liable under the

Massachusetts Tort Claims Act, Mass. Gen. L. ch. 258, 1 et

seq., for the allegedly negligent actions of Officers Meninno

and Sullivan, respectively.14 A public employer's

liability for the negligence of its employees is created by

section 2 of Chapter 258, which provides in relevant part:

Public employers shall be liable for
injury or loss of property or personal
injury or death caused by the negligent
or wrongful act or omission of any public
employee while acting within the scope of
his office or employment, in the same
manner and to the same extent as a
private individual under like
circumstances, . . . .

Mass. Gen. L. ch. 258, 2. The liability of a public

employer under section 2 is subject to several exceptions,

including the "discretionary function" exception found in

Mass. Gen. L. ch. 258, 10(b):

The provisions of sections one to eight,
inclusive, shall not apply to:

(a) . . .

(b) any claim based upon the
exercise or performance or the failure to
exercise or perform a discretionary



14. Appellant also alleged that Freetown was liable for the
negligence of the third police officer, Sadeck. However, as
explained in Part III.A., there is nothing in the record to
support a finding that Sadeck was in any way involved in the
pursuit and collision which injured appellant. His actions
are not actionable under Mass. Gen. L. ch. 258, 2.

-32-

function or duty on the part of a public
employer or public employee, acting
within the scope of his office or
employment, whether or not the discretion
involved is abused;
. . . .

Mass. Gen. L. ch. 258, 10.

We agree with appellant that the district court

erred in reasoning that because the police officers' actions

were "discretionary" for the purposes of qualified immunity

under federal law, they were also performing "discretionary

functions" for the purposes of the 10(b) exception. As we

have already explained, supra, it would be the rare case

indeed where an officer is denied qualified immunity because

the officer is found to have engaged in "ministerial" rather

than "discretionary" conduct. The discretionary function

exception in both the Massachusetts and the Federal Torts

Claims acts is altogether different from whatever narrow

exception may still exist under immunity law for

nondiscretionary ("ministerial") conduct. "Because of the

limitation of the [ 10(b)] exemption to conduct that is

policymaking or planning, the words 'discretionary function'

are somewhat misleading as a name of the concept." Harry

Stoller & Co. v. City of Lowell, 412 Mass. 139, 587 N.E.2d

780, 783 (1992) (hereinafter Stoller). The proper approach

is to apply Massachusetts law on the discretionary function

exception to appellant's Massachusetts Tort Claims Act claims

against Lakeville and Freetown.

-33-

After extensive consideration of Massachusetts case

law on the discretionary function exception, we are unable to

determine whether the exception applies to the actions of

Officer Meninno. Because answering that question implicates

important policy questions under Massachusetts state law, we

certify the question to the Supreme Judicial Court of

Massachusetts. As for the liability of Freetown for the

actions of Officer Sullivan, we find in Section B infra that

the district court prematurely granted summary judgment for

Freetown because there is a genuine issue of material fact

regarding Sullivan's discretion to engage in the allegedly

tortious conduct.

A. Liability of Lakeville for Meninno's Conduct A. Liability of Lakeville for Meninno's Conduct

1. Discretionary Function Exception Doctrine 1. Discretionary Function Exception Doctrine

Appellee Lakeville argues that it is immune from liability

under the Massachusetts Tort Claims Act because Meninno's

conduct falls within the discretionary function exception of

section 10(b), Mass. Gen. L. ch. 258, 10(b). The

discretionary function exception was first introduced in

Massachusetts in Whitney v. Worcester, 373 Mass. 208, 366

N.E.2d 1210 (1977), which preceded enactment of section

10(b). The Whitney court distinguished immune from nonimmune

conduct by drawing a dividing line "between those functions

which rest on the exercise of judgment and discretion and

represent planning and policymaking and those functions which

-34-

involve the implementation and execution of such governmental

policy or planning." Id., 366 N.E.2d at 1216. Massachusetts

courts still rely on the analysis in Whitney as containing

"guiding principles for determining the scope of the

discretionary function exception." Stoller, 587 N.E.2d at

783. Massachusetts courts also look for guidance to federal

court decisions interpreting the discretionary function

exception of the Federal Torts Claims Act ("FTCA"), 28 U.S.C.

2680(a). Id. After the Massachusetts legislature adopted

section 10(b), the test for whether particular conduct is

within the exception evolved over the years as the courts

confronted the application of the exception to various fact

scenarios. Like the federal discretionary function

exception, see id., the Massachusetts doctrine has not always

developed along a straight and clear line. Compare Cady v.

Plymouth-Carver Regional Sch. Dist., 17 Mass. App. Ct. 211,

457 N.E.2d 294 (1983) (holding that a function is

discretionary if there is no "fixed or readily ascertainable

standards to fall back upon") and Kelley v. Rossi, 395 Mass.

659, 481 N.E.2d 1340, 1344 n.6 (1985) (using the "fixed or

readily ascertainable standard" test of Cady) and A.L. v.

Commonwealth, 402 Mass. 234, 521 N.E.2d 1017, 1024 (1988)

(same) with Stoller, 587 N.E.2d at 784 n.2 (criticizing Cady

test and asserting that the S.J.C. had never adopted it).

-35-

For years, courts relied upon a distinction between

activities that occur at the "planning" and "operational"

levels of government to decide whether certain conduct is

immune from liability. See Patrazza v. Commonwealth, 398

Mass. 464, 497 N.E.2d 271, 274 (1986). The Supreme Court

questioned this distinction in United States v. S.A. Empresa

de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797

(1984), and recently in United States v. Gaubert, 111 S. Ct.

1267 (1992), the Court expressly rejected the planning-

operational distinction.

A discretionary act is one that involves
choice or judgment; there is nothing in
that description that refers exclusively
to policymaking or planning functions.
Day-to-day management of banking affairs,
like the management of other businesses,
regularly require judgment as to which of
a range of permissible courses is the
wisest. Discretionary conduct is not
confined to the policy or planning level.
"[I]t is the nature of the conduct,
rather than the status of the actor, that
governs whether the discretionary
function exception applies in a given
case." Varig Airlines, [] at 813, 104 S.
Ct., at 2764.

Gaubert at 1267. Whether an official's duties primarily

involve operations and administration as opposed to planning

is irrelevant because "it is the nature of the conduct,

rather than the status of the actor, that governs whether the

discretionary function exception applies in a given case."

Varig Airlines, 467 U.S. at 813; see Attallah v. United

States, 955 F.2d 776, 783 (1st Cir. 1992). The Court instead

-36-

articulated a two-part test, developed in Varig Airlines and

Berkovitz v. United States, 486 U.S. 531 (1988). The FTCA

discretionary function exception applies if, (1) the act

involved an element of judgment or choice, and, (2) the

action or decision was based on considerations of public

policy. Gaubert at 1273-74.

The Massachusetts Supreme Judicial Court cited

Gaubert with approval in Stoller, its most recent decision

construing section 10(b), and apparently adopted much of its

reasoning. The S.J.C. rejected the planning-operational

distinction, writing that, "[e]ven decisions made at the

operational level, as opposed to those made at the policy or

planning level, would involve conduct immunized by the

discretionary function exception if the conduct were the

result of policy determinations." Stoller, 587 N.E.2d at 784

(citing Gaubert). Stoller held that the proper test is: (1)

whether the governmental actor had discretion as to what

course of conduct to follow, and (2) whether the

discretionary conduct involves policymaking or planning. Id.

at 782-83. If both elements are present, then the

discretionary function exception applies.

2. Application of Stoller Test to Meninno's Conduct 2. Application of Stoller Test to Meninno's Conduct

To apply the two-part test here, we first must define what

conduct or course of action taken by Officer Meninno

appellant claims was negligent. She does not allege that her

-37-

injury came about because Meninno operated his vehicle in a

negligent manner while pursuing the motorcycle. Compare

Gaubert, 111 S. Ct. at 1275 n.7 ("If one of the officials

involved in this [bank regulation] case drove an automobile

on a mission connected with his official duties and

negligently collided with another car, the exception would

not apply."). Instead, she apparently claims that Meninno's

decision to keep pursuing the motorcycle for 3.2 miles after

it failed to stop was negligent.15 She proposes to show at

trial that a reasonable police officer would not have

persisted in such a pursuit under the circumstances.

The first element of the discretionary function

test set out in Stoller is whether Meninno "had any

discretion at all as to what course of conduct to follow."

Stoller, 587 N.E.2d at 782. A governmental actor has no

discretion if "a course of action was prescribed by a

statute, regulation, or established agency practice." Id.

Appellant concedes in her brief that, under the Lakeville

"High Speed Pursuit General Considerations and Guidelines,"

Meninno had discretion to make the final decision to pursue

at high speed, but argues that the guidelines completely

regulate the manner in which an officer conducts a pursuit,



15. As discussed in Part III.B. supra, appellant also
alleged that Meninno "herded" the motorcycle into Sullivan's
parked vehicle. Nothing in the record supports this
allegation.

-38-

leaving Meninno no discretion to make policy judgments and

mandating his every move.

We find this argument unpersuasive. Whether

Meninno properly weighed the guideline factors in deciding to

pursue is perhaps open to debate,16 but if as appellant



16. The first pages of the guidelines explain the general
policy of Lakeville regarding high speed pursuits:

As a general statement, high speed
pursuit is not recommended or favored.
This is because the potential danger to
the officer and the general public
outweighs the potential advantage of
apprehending a fleeing vehicle by such
means. Stated simply, pursuit is clearly
inappropriate when the pursuit itself
endangers life more than the escape of
the person pursued. Delay, while
distasteful, may be the wiser choice when
the person is known and he or she poses
no immediate threat to the community.

Under certain circumstances,
however, continuous high speed pursuit
may be authorized. When such pursuit is
undertaken, the purpose should be to
apprehend quickly and safely. . . .

When the pursuit would be
authorized, each officer must use his
discretion in determining whether or not
to commence a chase. Many factors should
have a bearing on his choice, but some of
the major ones may be listed:

1. road conditions;
2. traffic conditions;
3. time of day;
4. type of vehicle involved;
5. nature of the offense.

Once made, the decision to pursue is
not irrevocable, and it is the
intelligent officer who knows when to

-39-

has conceded the call was within his authority to make,

the existence of rules governing the manner of the chase did

not remove his discretion. These rules forbade certain

conduct, such as pursuing while nonpolice personnel are in

the police cruiser; and they mandate other conduct, like

wearing a seat belt. The crucial decisions, however

including whether and when to begin a pursuit, what speed to

maintain during it, how close to tail the pursued vehicle,

and how and when to terminate the pursuit are left to the

officer's discretion.17 For example, the only guideline

that speaks to the question of when to stop pursuing a

vehicle states: "[T]he officer in pursuit shall voluntarily

abandon pursuit when he determines that conditions of the



discontinue the chase. Briefly, and as a
general rule of thumb, it is often better
to abandon the pursuit where the risk of
danger to himself or to the public is
high or weather or road conditions are
poor. The experience and common sense of
each officer should also guide him in his
decision.

17. Horta also points to the following guideline provision:
"[A] continuing high speed pursuit . . . is authorized, but
only when the pursuing officer . . . has reasonable grounds
to arrest the person pursued for a serious felony . . . or
when the vehicle being pursued is being operated in such a
manner as to endanger the public."

Horta argues that there was no evidence of a prior
felony. However, Meninno was entitled to determine that the
motorcycle was endangering public safety. In his deposition,
Meninno testified that the motorcycle veered into the
oncoming lane at times and, at one point, drove close to a
group of pedestrians on the roadside, causing them to jump
back. In his opinion, the motorcycle driver was intoxicated.

-40-

road, weather, traffic or other factors necessitates [sic]

abandonment." This, like the other guidelines, is not a

strict rule prescribing certain conduct. Assuming Meninno

had discretion to determine whether or not to pursue, we can

find nothing in the regulations that removed that discretion

on the facts of this case. Accordingly, Meninno had the

requisite discretion prescribed in Stoller.

"The second and far more difficult step is to

determine whether the discretion that the actor had is the

kind of discretion for which section 10(b) provides immunity

from liability." Stoller, 587 N.E.2d at 782. The

discretionary function exception, under both the

Massachusetts Tort Claims Act and the Federal Tort Claims

Act, provides immunity only for discretionary "conduct that

involves policymaking or planning." Id. at 783. The

question is not whether the employee worked at a "planning"

or "operational" level, but whether the type of decision or

action at issue, by whatever level employee, is one based on

considerations of governmental policy. Id. at 784; see also

Gaubert, 111 S. Ct. at 1275-76; Varig Airlines, 467 U.S. at

813. Not only broad, abstract decisions of policy are

immune. Discretionary functions include specific, individual

applications of policy, "those [decisions] in which a

government official determines what action to take based on

an individual, case-by-case analysis and in which his

-41-

decision includes elements of judgment and discretion." Pina

v. Commonwealth, 400 Mass. 408, 510 N.E.2d 253, 257 (1987)

(quoting Bartel v. Federal Aviation Admin., 617 F. Supp. 190,

196 n.29 (D.D.C. 1985)); Patrazza, 497 N.E.2d at 274.

This is obviously not a bright-line rule, and a

court must assess cases on their facts, keeping in mind the

purposes of the discretionary function exception. Stoller,

587 N.E.2d at 783. Only discretionary acts and decisions

based on considerations of public policy are exempted because

"the purpose of the exception is to 'prevent judicial

"second-guessing" of legislative and administrative decisions

grounded in social, economic, and political policy through

the medium of an action in tort.'" Gaubert, 111 S. Ct. at

1273 (quoting Varig Airlines, 467 U.S. at 814). Thus, "[i]f

the injury-producing conduct was an integral part of

government policymaking or planning, if the imposition of

liability might jeopardize the quality of the governmental

process, or if the case could not be decided without usurping

the power and responsibility of either the legislative or

executive branch of government, governmental immunity would

probably attach." Stoller, 587 N.E.2d at 783 (citing

Whitney, 366 N.E.2d at 1217). If none of these factors are

present, the general rule is one of no governmental immunity.

Whitney, 366 N.E.2d at 1217.

-42-

Applying the above principles to the facts of this

case, without regard for the particular result of the Stoller

case, see infra, it can be forcefully contended that

Meninno's decisions were of the type based on policy

considerations. Clearly, the Commonwealth has a policy for

enforcement of the laws by constables and police officers.

The Lakeville police department and its officers are charged

by the Legislature with the duty to enforce the laws, see 41

M.G.L.A. 98, within the limits imposed by the federal and

state constitutions and the legislature. Police chiefs are

authorized to promulgate regulations for their officers in

furtherance of these duties. See 41 M.G.L.A. 97A.

Lakeville adopted guidelines that allow Lakeville police

officers to conduct and participate in high speed pursuits

when, in their judgment, the benefit of apprehension

outweighs the risk to public safety. See also 41 M.G.L.A. 

98A (authorizing police to arrest suspects "on fresh and

continued pursuit" in other jurisdictions). Acting within

discretion conferred by the guidelines, Meninno decided that

the best way to fulfill his duty to enforce the law here was

to pursue a violator who had refused to obey his signal to

pull over. Surely, such a decision was based on policy

considerations. Compare Irwin v. Town of Ware, 392 Mass.

745, 467 N.E.2d 1292, 1299 (1984) (holding that police

officer was not performing discretionary function in

-43-

releasing known drunk driver because he acted contrary to

established policy); Gaubert, 111 S. Ct. at 1275 n.7 (in

hypothetical, negligent driving by bank regulator has no

connection to regulatory policy of banking agency).

Appellant clearly could not argue that the

Lakeville police department's adoption of the pursuit

guidelines was itself a negligent act for which it is liable.

See Patrazza, 497 N.E.2d at 274 & n.3. That legitimately

adopted policy required Meninno to exercise his own judgment,

under the particular circumstances of each incident, as to

how best to fulfill the policy's dual goals of apprehending

lawbreakers and protecting public safety. "When established

governmental policy, as expressed or implied by statute,

regulation, or agency guidelines, allows a Government agent

to exercise discretion, it must be presumed that the agent's

acts are grounded in policy when exercising that discretion."

Gaubert, 111 S. Ct. at 1274 (emphasis added). Thus, under

the Gaubert analysis, it would be presumed that Meninno's

actions were grounded in policy.

This presumption prevails unless the plaintiff

points to facts in the record "which would support a finding

that the challenged actions are not the kind of conduct that

can be said to be grounded in the policy of the regulatory

regime." Id. at 1275. Plaintiff has pointed to nothing that

would support a finding that the allegedly negligent

-44-

decisions of Meninno are not the kind of conduct that can be

said to be grounded in policy. For example, she does not

allege that Meninno accidentally lost control of his vehicle

and hit the motorcycle, or that he acted for some ulterior

purpose. Therefore, if the rules laid out in Gaubert apply

in Massachusetts, it would seem that Meninno's conduct was

within the section 10(b) exception.

3. Purposes of Discretionary Function Exception As 3. Purposes of Discretionary Function Exception

mentioned above, Massachusetts law also requires a court to

consider whether the purposes of the discretionary function

exception are fulfilled by including the alleged conduct

within the scope of the section 10(b) exception. Making that

judgment here is difficult.

In favor of Lakeville, one could argue that "the

imposition of liability might jeopardize the quality of the

governmental process." Stoller, 587 N.E.2d at 783. If

suspects and their accomplices can sue towns for the

strategic decisions of police officers during attempts to

apprehend them, then towns especially those with financial

difficulties already will have a strong incentive to avoid

pursuing suspected and known lawbreakers. If the otherwise

legitimate enforcement of laws is chilled by fear of

liability, all types of criminals, not only traffic

violators, would be able to more easily avoid apprehension

and prosecution. Police departments would be hampered in

-45-

their ability to control crime and fulfill their statutory

duty to enforce the laws of the Commonwealth.

In addition, one could argue, "the case could not

be decided without usurping the power and responsibility of

[] the . . . executive branch of government." By permitting

judges and juries to pass on the strategies used by the

police (assuming they do not violate constitutional norms),

the power of police departments to fulfill their statutory

duty to enforce the law could be usurped. The state

legislature could have, but did not, impose limits on the

police power to pursue suspects. See 41 M.G.L.A. 98A

(authorizing police to arrest suspects "on fresh and

continued pursuit" in other jurisdictions without restriction

on the means of pursuit); compare Irwin, 467 N.E.2d at 1299,

1302 (finding that legislature imposed duty on police to take

all suspected drunk drivers into custody).

"Other relevant considerations are the reasonable

expectations of the injured person with respect to his

relationship to the governmental entity in question, the

nature of the duty running from the government to the

governed in the particular case, and the nature of the

injury." Whitney, 366 N.E.2d at 1217. It would be difficult

for Horta to argue that she, as a passenger on a vehicle

attempting to evade police pursuit, reasonably expected the

-46-

police to avoid all potentially risky attempts to capture her

and her companion.

On the other hand, appellant could argue with some

persuasiveness that the injury-producing conduct was not "an

integral part of governmental policymaking or planning."

This consideration may refer to general, legislative-type

decisions as opposed to administrative or operational tasks.

See Dobos v. Driscoll, 404 Mass. 634, 537 N.E.2d 558, 568,

cert. denied, 493 U.S. 850 (1989); Pina, 510 N.E.2d at 256.

Moreover, appellant has no adequate alternative remedy for

her injuries, Whitney, 366 N.E.2d at 1217, except perhaps to

sue the estate of the motorcycle operator.

Hence, it is unclear whether the purposes of the

discretionary function exception are advanced by immunizing

Lakeville here. Nonetheless, not all the Whitney

considerations must point to immunity for the exception to

apply. See, e.g., Pina, 510 N.E.2d at 256.

4. Comparison of Analogous Massachusetts and 4. Comparison of Analogous Massachusetts and

Federal Cases There is no Massachusetts case precisely on Federal Cases

point, and the few cases cited by appellant provide little

guidance. In Irwin v. Town of Ware, the court held that "the

decision of a police officer [not] to remove from the

roadways a driver who he knows or has reason to know is

intoxicated" is not a discretionary act within the meaning of

section 10(b). Id., 467 N.E.2d at 1298. Unlike here,

-47-

however, the court in Irwin expressly found that the police

officer, once he knew or had reason to know that the driver

he stopped was intoxicated, had no policy-based discretion to

permit the driver to go back on the road. Id. at 1299. The

Irwin court interpreted several state statutes as obligating

police officers to remove known intoxicated drivers from the

roads, determining that the officer's decision not to remove

a drunk driver could not have been based on policy

considerations because "the policy and planning decision to

remove such drivers has already been made by the

Legislature." Id. As discussed above, Meninno was not

obligated by statute or regulation to take or refrain from

taking the actions at issue. Instead, he was authorized by

written policies to use his own judgment as to how and when

to enforce the law by means of a high speed pursuit. In

Stuart v. Town of Brookline, 412 Mass. 251, 587 N.E.2d 1384

(1992), the court upheld a finding of liability against a

town for injuries caused by the negligent operation of a

police cruiser, but section 10(b) immunity was not even an

issue in that case.

Appellant's citation of Kelley v. Rossi, is equally

unavailing. There the court wrote, in two sentences in a

footnote, that a doctor employed by a city hospital and

accused of medical malpractice is not engaged in a

discretionary function when treating a patient. Id., 481

-48-

N.E.2d at 1344 n.6. "The doctor was governed by the standard

of accepted medical practice, an ascertainable guide to

proper conduct." Id. (citing Cady v. Plymouth-Carver

Regional Sch. Dist.). There is no evidence in the record

that Meninno's actions were governed by such a fixed standard

for police conduct. Moreover, the Massachusetts Supreme

Judicial Court recently criticized the reasoning in the case

relied upon by the Kelley court:

In Cady v. Plymouth-Carver Regional
School Dist., 17 Mass. App. Ct. 211, 457
N.E.2d 294 (1983), the Appeals Court
announced a principle that it thought
distinguished between functions that are
discretionary and those that are not. If
the employee has no "fixed or readily
ascertainable standards to fall back
upon," the employee's conduct is
discretionary. Id. at 215, 457 N.E.2d
294. . . . The United States Supreme
Court has not adopted the rule. Nor have
we. The existence of fixed or readily
ascertainable standards could be relevant
in deciding whether a governmental actor
owed a duty to another that he
negligently failed to fulfill, but it
tells us nothing about whether particular
discretionary conduct has a policy or
planning foundation.

Stoller, 587 N.E.2d at 784 n.2. The many other decisions

applying section 10(b) depend heavily on the facts and

provide no general principles beyond those articulated in

Stoller. See Stoller, 587 N.E.2d at 784 (summarizing cases).

As instructed by Stoller, we also look for guidance

to federal court decisions. A finding of immunity in this

case would be consistent with many cases holding that

-49-

decisions of law enforcement officers, although seemingly

"operational" and made in the heat of the moment, fall within

the FTCA discretionary function exception. Generally,

although law enforcement agents have a mandatory duty to

enforce the law, decisions as to how best to fulfill that

duty are protected by the discretionary function exception to

the FTCA. Abernathy v. United States, 773 F.2d 184, 188 (8th

Cir. 1985); Redmond v. United States, 518 F.2d 811, 816-17

(7th Cir. 1975); United States v. Faneca, 332 F.2d 872, 874-

75 (5th Cir. 1964), cert. denied, 380 U.S. 971 (1965). For

example, we held that a decision by United States Customs

agents not to stop and search a particular passenger falls

within the discretionary function exception of the FTCA

because the applicable statute and regulations authorize, but

do not obligate, the agents to search passengers. Attallah,

955 F.2d at 784. Like the situation here, "there is room for

choice on the part of the Customs agents when carrying out

their duties," and "[t]he decision an agent makes is of great

importance in fulfilling the mandate of the Customs Service

to protect the integrity of our national borders." Id.;

see also Prelvitz v. Milsop, 831 F.2d 806, 810 (8th Cir.

1987) (finding FTCA discretionary function exception

applicable to customs inspector's decisions to detain four

intoxicated men in an automobile at a border crossing and to

"appoint" a different driver). In Buchanan v. United States,

-50-

915 F.2d 969 (5th Cir. 1990), the court held that a prison

warden's and staff members' "minute-to-minute decision making

in the chaotic circumstances of a riot" met the requirements

of the discretionary function exception. Id. at 972; see

also Faneca, 332 F.2d at 874-75 (holding that decisions and

tactics used by federal law enforcement officials in

enforcing desegregation orders and handling resulting riots

were within the FTCA discretionary function exception); Smith

v. United States, 330 F. Supp. 867, 868-70 (E.D. Mich. 1971)

(holding that FTCA discretionary function exception applied

to law enforcement officials' plans and decisions as to

handling of Detroit riots); Nichols v. United States, 236 F.

Supp. 260, 262-63 (N.D. Miss. 1964) (holding that FTCA

discretionary function exception applied to methods used by

federal law enforcement officials in enforcing desegregation

orders and quelling riots). FBI agents' decisions to arrest

bank robbers and to employ certain tactics to arrest them

were also found to be protected by the discretionary function

exception from a suit by one bank robber for injuries

sustained during the arrest. Amato v. United States, 549 F.

Supp. 863, 866-67 (D.N.J. 1982), aff'd, 729 F.2d 1445 (3d

Cir. 1984). But see Hetzel v. United States, No. 91-2986,

1993 U.S. Dist. LEXIS 7506, at *12-*13 (D.D.C. 1993) (finding

that government agents' high-speed pursuit on crowded city

streets of suspected drug trafficker, whose identity and

-51-

address were known, violated approved procedures and so was

not within the FTCA discretionary function exception); Patel

v. United States, 806 F. Supp. 873, 878 (N.D.Cal. 1992)

(holding that decisions by DEA agents to investigate, obtain

search warrant and raid suspected drug hideout were

discretionary functions, but decision to destroy house and

kill occupants with firebombs was not made pursuant to DEA

policy and thus not immune).

5. Holding in Stoller So far, it would appear that 5. Holding in Stoller 

the principles of the section 10(b) exception doctrine as

articulated in Stoller and, by analogy, Gaubert point

toward tort immunity under the discretionary function

exception. We have yet, however, to consider the actual

holding in Stoller. Doing so, we are unable to reconcile a

finding of immunity here with that holding.

In Stoller, the owner of buildings destroyed by

fire sought damages pursuant to the Massachusetts Tort Claims

Act from the city of Lowell, whose firefighters

unsuccessfully fought the blaze. He alleged negligence on

the firefighters' part in failing to use the sprinkler

systems in one of the buildings. The city conceded that it

had a duty to the building owner and that the firefighters

could have been found negligent in failing to follow the

standard firefighting technique of use of available sprinkler

systems. The city, nonetheless, argued that it was immune

-52-

under section 10(b) because the firefighters' conduct

involved a discretionary function. Id., 587 N.E.2d at 782. 

The trial judge agreed that the city was immune,

but the Supreme Judicial Court reversed. Applying the two-

part test discussed supra, the court found that, (1) the

firefighters had "discretion in the sense that no statute,

regulation, or established municipal practice required the

firefighters to use the sprinklers (or, for that matter, to

use hoses exclusively)," but that, (2) "whatever discretion

they had was not based on a policy or planning judgment."

Id. at 785.

There are aspects of firefighting
that can have an obvious planning or
policy basis. The number and location of
fire stations, the amount of equipment to
purchase, the size of the fire
department, the number and location of
hydrants, and the quantity of the water
supply involve policy considerations,
especially the allocation of financial
resources. In certain situations,
firefighting involves determinations of
what property to attempt to save because
the resources available to combat a
conflagration are or seem to be
insufficient to save all threatened
property. In such cases, policy
determinations might be involved, and
application of the discretionary function
exception would be required.

The case before us is different.
The negligent conduct that caused the
fire to engulf all the plaintiff's
buildings was not founded on planning or
policy considerations. The question
whether to put higher water pressure in
the sprinkler systems involved no policy
choice or planning decision. There was a

-53-

dispute on the evidence whether it was
negligent to fail to fight the fire
through the buildings' sprinkler systems.
. . . The jury decided that, in
exercising their discretion not to use
the buildings' sprinkler systems, the
Lowell firefighters were negligent
because they failed to conform to
generally accepted firefighting
practices. When the firefighters
exercised that discretion, policy and
planning considerations were not
involved. Therefore, the discretionary
function exception does not shield the
city from liability.

Id.

It is hard to differentiate between the

firefighters' conduct in Stoller and the allegedly negligent

decision to pursue of Officer Meninno. The firefighters, in

execution of their duty to fight fires, deliberately chose at

the time what we assume they considered to be the appropriate

strategy for fighting the fire. While, in retrospect, their

judgment may have been flawed, no statute, regulation or

municipal policy required any different, and they were

authorized, indeed required, to make such a determination on

their own. An injured party alleged and eventually persuaded

a jury that their strategic choice, made pursuant to their

governmental duties and in conformance with applicable

policies, was negligent. Here, a police officer, in

execution of his duty to enforce the laws of the

Commonwealth, deliberately chose what he considered to be the

best strategy for apprehending a lawbreaker. No statute,

-54-

regulation or policy prohibited his actions. A town policy

expressly authorized and required him to exercise his own

judgment as to how to proceed. An injured party now alleges

and hopes to persuade a jury that his strategic decision was

negligent. Comparing the result in Stoller to this case, one

can argue that section 10(b) does not shelter Lakeville from

liability for Meninno's actions. Still, it may be that

Stoller turned on the firefighters' having violated standard

practices with no apparent policy justification, hence is not

to be read as more generally eliminating lower level

firefighting and police decisions from the section 10(b)

exception.

In attempting to understand the reasoning of the

Stoller court, we have reviewed similar cases from other

jurisdictions. A sizable number of them reach the opposite

result in analogous circumstances. See 57 Am. Jur.2d

Municipal, County, School and State Tort Liability 484, at

449 (summarizing cases from ten states). For example, in

City of Daytona Beach v. Palmer, 469 So.2d 121 (Fla. 1985),

the Florida Supreme Court explained:

The decisions of how to properly
fight a particular fire, how to rescue
victims in a fire, or what and how much
equipment to send to a fire, are
discretionary judgmental decisions which
are inherent in this public safety
function of fire protection. . . . To
hold a city liable for the negligent
decisions of its fire-fighters would
require a judge or jury to second guess

-55-

fire-fighters in making these decisions
and would place the judicial branch in a
supervisory role over basic executive
branch, public protection functions in
violation of the separation of powers
doctrine.

We distinguish these types of
discretionary fire-fighting decisions
from negligent conduct resulting in
personal injury while fire equipment is
being driven to the scene of a fire or
personal injury to a spectator from the
negligent handling of equipment at the
scene.

Id. at 123. 

We feel unable to determine the precise aspect of

the circumstances in the firefighters' conduct in Stoller

that led the court to find their actions were not of the type

based on policy considerations. And we are disinclined to

introduce new doctrines or fine distinctions of our own into

Massachusetts law in order to differentiate the firefighters

from Meninno. Yet, neither can we ignore the principles,

rules and guidelines articulated by the Massachusetts court

in Stoller and in other cases, which apparently point in

another direction, so as seemingly to lead to the conclusion

that Lakeville is entitled to immunity for the strategic

decisions of its police officers made in furtherance of their

duties.

6. Certification Essentially, we are faced with 6. Certification

this dilemma: the Massachusetts discretionary function

doctrine as expounded in Stoller and Gaubert suggests a

-56-

finding of immunity, while the result in Stoller seems to

mandate the opposite. Resolution of the issue in this case

requires reconciling Stoller with Gaubert and other federal

and state cases, a project properly left to the courts of the

Commonwealth because it may require the development of new

rules or distinctions. Moreover, whichever way we decided

the issue, our opinion would be seen in Massachusetts as

either barring or permitting many other actions against

public employers for decisions made by police officers and

other municipal servants. We also take notice of the current

debate in the Commonwealth on the closely related issue of

the public duty rule. See Jean W. v. Commonwealth, 414 Mass.

496, 610 N.E.2d 305 (Mass. 1993) (abolishing court-created

public duty rule prospectively after 1993 legislative

session); see also Cyran v. Town of Ware, 413 Mass. 452, 597

N.E.2d 1352 (1992) (holding, in 3-2 decision, that town

firefighters owed no special duty to homeowners whose house

was destroyed by fire). The difficult questions raised by

the various concurring opinions in Jean W., and the lack of a

majority opinion, cautions us about the complexity and social

importance of the municipal liability issue in Massachusetts.

For these reasons, the best course for a federal court, bound

to apply state law as it stands, is certification.

-57-

On our own motion, we will certify in a separate

certification order the following question to the Supreme

Judicial Court of Massachusetts pursuant to S.J.C. Rule 1:03:

Do the discretionary decisions of a
police officer to begin and continue the
high-speed pursuit of a vehicle then
being operated in violation of law
involve policymaking or planning for
purposes of immunity under Massachusetts
General Law ch. 258, 10(b)?

If the question is answered in the affirmative, then the

discretionary function exception applies to Meninno's conduct

and the district court's grant of summary judgment for

Lakeville on this claim will be affirmed. If the question is

answered in the negative, then summary judgment was improper

and the claim will be remanded to the district court for

further proceedings. We would, of course, welcome any

guidance the S.J.C. may care to provide, beyond answering the

question, concerning the effect and proper application of

Massachusetts law in these circumstances. The clerk of this

court shall forward as an appendix the briefs and appendix

furnished to us by the parties.

B. Liability of Freetown for Sullivan's Conduct B. Liability of Freetown for Sullivan's Conduct

Appellee Freetown argues that it is immune from

liability under the Massachusetts Tort Claims Act because

Sullivan's conduct falls within the discretionary function

exception of section 10(b). After reviewing the record in

the light most favorable to the appellant, we hold that the

-58-

district court should not have granted summary judgment for

Freetown on this issue because there is a genuine issue of

material fact concerning the first element of the two-part

test for discretionary function immunity: whether Sullivan

had discretion to engage in the allegedly negligent conduct.

The Freetown pursuit guidelines in effect at the

time were identical to Lakeville's, and are silent as to most

of the decisions made by Sullivan. However, appellant

sensibly asks how Sullivan's decision to erect a partial

roadblock could be within his discretionary authority when

paragraph 12 of the Freetown guidelines expressly states,

"Intentional contact between a police vehicle and the vehicle

pursued, or use of a police vehicle as a roadblock, is

strictly forbidden." The language of this departmental rule

appears on its face to forbid the very actions taken by

Sullivan. But the record also contains testimony by Officer

Sullivan that he interpreted Paragraph 12 to mean merely that

police vehicles may not be used to block an entire roadway,

as when a cruiser is placed sideways so as to obstruct both

lanes of a two-lane road. According to Sullivan, the term

"roadblock" has not been interpreted by the Freetown police

to include a partial roadblock, such as the one established

-59-

by Sullivan when he parked his cruiser in the oncoming lane,

which leaves room for a vehicle to pass on one side.18



18. The affidavit of appellee Mello, the Freetown police
chief, indicates that an official investigation of Sullivan's
actions concluded that Officer Sullivan acted appropriately
in the circumstances. Chief Mello stated that Freetown had
pursuit guidelines in place, but he did not suggest that
Sullivan had violated any of these guidelines by using a
partial roadblock.
The following colloquy regarding paragraph 12 of the
Freetown guidelines appears in Officer Sullivan's deposition:

Q: [Mr. Gillis, plaintiff's attorney]: So, prior
to the collision that is the subject of this
lawsuit, you had in your possession a handbook
given to you by your commanding officer, is
that correct?
A: [Sullivan]: Yes, it is.

Q: Okay. That handbook contained a section on
the policies of the Freetown Police Department
concerning pursuing other motor vehicles, did
it not?
A: Yes, it did.

Q: Did it also have a section on the use or
nonuse of roadblocks; of blocking the road
during pursuits?
A: Mr. Gillis, could you define for me what you
think, what you would say was a "roadblock"
and what is "blocking the road"? I think in
my mind they're two different things.

Q: Why don't you tell me? What's "blocking the
road" mean to you, sir?
A: Blocking the roadway would be blocking the
total roadway so that nothing could pass your
point.

Q: Okay. And what is a "roadblock"?
A: A roadblock would be one and the same. The
roadblock would be blocking the whole roadway.

. . .

Q: Was there a section in this manual that you
were given before August 5, 1988, concerning

-60-

On this record, there is an unresolved issue of

fact regarding Sullivan's discretion under pertinent

regulations to have created a partial roadblock, the

allegedly negligent conduct on his part. Sullivan's

testimony, and Chief Mello's affidavit, suggest the

possibility of a narrowed reading of the rule so as to allow

Sullivan to do what he did. See, e.g., Kelly v. United

States, 924 F.2d 355, 360-61 (1st Cir. 1991) (holding that,



the use of roadblocks or blocking the roadway?
Is there a policy for that in the Town of
Freetown?
A: Roadblocks as blocking the whole roadway?

Q: Yes.
A: Yes, there is.

Q: And what was that?
A: Roadblocks blocking the whole roadway are not
allowed under the policy.

. . .

Q: (Pause) Again, referring to that manual that
you mentioned before, that you were given
sometime in 1987, or at least prior to August
5, 1988, does the manual say anything specific
about blocking the roadway?
A: Okay. Again, when you say "blocking the
roadway," do you mean a roadblock

Q: I mean blocking the roadway in any manner.
A: Yes, it does.

Q: Blocking a travel lane, or blocking the other
lane, in any manner. What does it say about
blocking the road?
A: The manual advises that to block one lane-way
of a roadway, to block some portion of a
roadway is permissible. But you are not to
block the whole roadway.

-61-

to avoid summary judgment, plaintiff DEA agent was required

to rebut defendants' evidence that seemingly nondiscretionary

regulation was consistently interpreted by DEA officials to

permit use of discretion). But the language of the

regulation, read in the light most favorable to Horta, seems

rather directly to forbid such conduct. There is, therefore,

a factual issue over whether the regulation should be read to

withhold discretion here or whether the departmental

interpretation claimed by Sullivan actually existed and was

sufficiently consistent and longstanding so as to render his

conduct discretionary. Because of this factual issue over

whether the first element of the discretionary function

exception test was fulfilled, we do not reach whether

Sullivan's conduct was based on policy or planning

considerations. The latter is, in large measure, the same

question certified to the S.J.C. in the case of Meninno. The

S.J.C.'s resolution regarding Meninno may answer it. For the

moment, we hold simply that Freetown was not entitled to

summary judgment on the issue of section 10(b) immunity and

remand Horta's claim to the district court for further

proceedings.19

V. V.



19. We do not consider to what extent resolution of this
issue is within the province of the district judge as opposed
to the jury. The district court, with the assistance of the
parties, should initially determine this.

-62-

In conclusion: we affirm the grant of summary

judgment for appellees Sadeck, Meninno, and Sullivan on Count

I, alleging liability under 42 U.S.C. 1983; we affirm the

grant of summary judgment for Freetown on Count IV under the

Massachusetts Tort Claims Act for the actions of Sadeck, and

vacate the grant of summary judgment for Freetown on Count IV

under the Massachusetts Tort Claims Act for the actions of

Sullivan and remand that claim for further proceedings; we

certify a question of law to the Supreme Judicial Court of

Massachusetts on the issue of Lakeville's liability on Count

IV under the Massachusetts Tort Claims Act and, pending that

court's determination, retain jurisdiction on that issue; and

we affirm dismissal of all the remaining claims because

appellant did not appeal their dismissal by the district

court.

Affirmed in part, vacated and remanded in part, and

a question certified to the Supreme Judicial Court of

Massachusetts, with jurisdiction retained pending that

determination. No costs.

-63-

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1962

DEBRA HORTA,

Plaintiff, Appellant,

v.

CHARLES B. SULLIVAN, ET AL.,

Defendants, Appellees.

CERTIFICATION

For the reasons discussed in our opinion in this

case, Horta v. Sullivan, No. 92-1962, (see especially Part

IV.A., at pp. 32-55), the resolution of an important issue

depends upon questions of Massachusetts law on which we are

unable to find clear, controlling precedent in the decisions

of the Supreme Judicial Court of Massachusetts. Accordingly,

we certify the following question to the Supreme Judicial

Court of Massachusetts pursuant to its Rule 1:03.

Do the discretionary decisions of a

police officer to begin and continue the

high- speed pursuit of a vehicle then

being operated in violation of law

involve policymaking or planning for

purposes of immunity under Massachusetts

General Law ch. 258, 10(b)?

The relevant facts are discussed in the separate opinion in

this case. In putting the above question, we wish to make

clear that we would, of course, welcome the advice of the

court on any other question of Massachusetts law it deems

material to this case on which it would wish to comment.

The Clerk of this court will transmit this question

and our separate opinion in this case, along with copies of

the briefs and appendix in this case to the Supreme Judicial

Court of Massachusetts.

United States Court of Appeals
for the First Circuit

By: Juan R. Torruella
Circuit Judge

Dated: August , 1993

- 65 -